UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

Keren Kayemeth LeIsrael-Jewish National Fund      :
1 KKL Street                                      :
Jerusalem, Israel 9242801                         :
                                                  :
and                                               :
                                                  :
Asher Goodman                                     :
Menachem Begin 106/8                              :
Sderot, Israel                                    :
                                                  :
and                                               :
                                                  :
Batsheva Goodman                                  :      Civil Action No.
Menachem Begin 106/8                              :
Sderot, Israel                                    :
                                                  :
and                                               :
                                                  :
Ephriam Rosenfeld                                 :
3 Uzi Hitman Street                               :
Sderot, Israel                                    :
                                                  :
and                                               :
                                                  :
A.R.                                              :
By and through his Parents and Guardians          :
Ephriam and Kineret Rosenfeld                     :
3 Uzi Hitman Street                               :
Sderot, Israel                                    :
                                                  :
and                                               :
                                                  :
B.R.                                              :
By and through his Parents and Guardians          :
Ephriam and Kineret Rosenfeld                     :
3 Uzi Hitman Street                               :
Sderot, Israel                                    :
                                                  :
and                                               :
                                                  :
H.R.                                              :
By and through her Parents and Guardians          :
Ephriam and Kineret Rosenfeld                     :

3 Uzi Hitman Street                                  :
Sderot, Israel                                       :
                                                     :
and                                                  :
                                                     :
Bracha Vaknin                                        :
175 Sederot Yerushalayim                             :
Netivot, Israel 80200                                :
                                                     :
and                                                  :
                                                     :
S.M.V.                                               :
By and through his Parents and Guardians             :
Bracha and Yosef Vaknin                              :
175 Sederot Yerushalayim                             :
Netivot, Israel 80200                                :
                                                     :
and                                                  :
                                                     :
E.V.                                                 :
By and through his Parents and Guardians             :
Bracha and Yosef Vaknin                              :
175 Sederot Yerushalayim                             :
Netivot, Israel 80200                                :
                                                     :
and                                                  :
                                                     :
M.V.                                                 :
By and through her Parents and Guardians             :
Bracha and Yosef Vaknin                              :
175 Sederot Yerushalayim                             :
Netivot, Israel 80200                                :
                                                     :
and                                                  :
                                                     :
S.R.V.                                               :
By and through her Parents and Guardians             :
Bracha and Yosef Vaknin                              :
175 Sederot Yerushalayim                             :
Netivot, Israel 80200                                :
                                                     :
and                                                  :
                                                     :
A.V.                                                 :
By and through her Parents and Guardians             :
Bracha and Yosef Vaknin                              :

175 Sederot Yerushalayim                          :
Netivot, Israel 80200                             :
                                                  :
                                    Plaintiffs,   :
                                                  :
                          v.                      :
                                                  :
Education for a Just Peace in the Middle East     :
d/b/a US Campaign for Palestinian Rights          :
1736 Columbia Road, NW                            :
Washington DC 20009                               :
                                                  :
      Serve:  Andrew Kadi                         :
              3601 Wisconsin Avenue, NW           :
              Washington, DC 20016                :
                                                  :
                                    Defendant.    :
                                                  :

## NATURE OF ACTION

1.      This is a complaint for damages arising out of the unlawful conduct of Education

for Just Peace in the Middle East d/b/a US Campaign for Palestinian Rights (hereinafter "USCPR"

or "Campaign" or "Defendant")– a U.S. based charity organized under the laws of the District of

Columbia[1]. USCPR has conducted and participated in a planned campaign and conspiracy against

the Plaintiff, Keren Kayemet LeIsrael – Jewish National Fund ("KKL-JNF" or "KKL"), and Asher

Goodman, Batsheva Goodman, Ephriam Rosenfeld, A.R., B.R., H.R., Bracha Vaknin, S.M.V.,

E.V., M.V., S.R.V., and A.V. (hereinafter collectively the "Individual Plaintiffs") and knowingly

provides, distributes, and administers financial benefits, money, financial services and provides

material support and encouragement to: (a) terrorists who killed, injured and maimed civilians,

damaged property or attempted to do so; (b) Foreign Terrorist Organizations (as that term is

defined in 8 U.S.C. § 1189 of the Antiterrorism and Effective Death Penalty Act of 1996

---

[1]USCPR's formal name is Education for a Just Peace in the Middle East and does business under the name US
Campaign for Palestinian Rights.

("AEDPA")) in order to facilitate, encourage and provide material support for acts of international terrorism, as defined by 18 U.S.C. § 2331.

2.      By these acts, Defendant USCPR aided and abetted said acts of international terrorism, resulting in the destruction of property, as well as causing tremendous emotional and psychological distress suffered by each of the Individual Plaintiffs. USCPR's conduct violated the prohibitions on providing material support for acts of international terrorism set forth in the Anti-Terrorism Act ("ATA"), as amended by the AEDPA (*see, e.g.*, 18 U.S.C. §§ 2339A and 2339B). As a result, USCPR is civilly liable under § 2333 of the ATA to these American citizens who have suffered injury to their person, property or business by reason of such acts of international terrorism.

3.      Defendant USCPR is also civilly liable for the pendent common law claims of trespass, public nuisance, and tortious interference with the business activities of Plaintiff KKL-JNF, as the Defendant has caused damage to Plaintiffs' property, business, operations and/or activities and  to the general public in Israel,  by engaging in a planned campaign and conspiracy and/or supported a series of terrorist attacks designed to, and which has in fact, caused ecological and environmental damage, harm to the public health, safety and peace to individuals residing in the civilian cities and towns in Israel which border the Gaza strip ("Gaza") known as the "Gaza Envelope", including, but not limited to, the Plaintiffs in this Action, each of whom have been caused to suffer damages as a direct consequence of the acts of the Defendant.

## JURISDICTION AND VENUE

4.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, 1367 which provides for federal question and supplemental jurisdiction over all claims related thereto. 18 U.S.C. §§ 2333 and 2334 provides for jurisdiction over civil actions brought by

citizens of the United States, their estates, survivors, and heirs who have been killed or injured by reason of acts of international terrorism.

5.      Venue is proper in this District pursuant to 18 U.S.C. § 2334(a).

6.      USCPR is subject to personal jurisdiction in the District of Columbia pursuant to 18 U.S.C. § 2334(a) and Fed. R. Civ. P. 4(k)(1)-(2) because: (a) it has at all times relevant hereto been organized under and transacted business and committed tortious acts within the United States and this District and has participated in the United States and in this District in a planned campaign and conspiracy which has heretofore and continues to promote and support the Islamic Resistance Movement, *Harakat al-Muqaawama al-Islamiya*, ("HAMAS"), a Foreign Terrorist Organization so designated by the US government ("FTO"), and other designated terrorist organizations;  (b) it has purposefully availed itself of the laws of the United States and this District in the course of committing the wrongful acts alleged herein; and (c) it resides in this District and committed the wrongful conduct that Plaintiffs allege to have been perpetrated by and through agents and representatives of USCPR located in as well as outside of this District.

## THE PARTIES

### I.      The Plaintiffs

### Keren Kayemeth LeIsrael - Jewish National Fund

7.      Plaintiff Keren Kayemeth LeIsrael-Jewish National Fund is registered as a Public Benefit Company which is organized and is existing under Israeli law.  Plaintiff KKL-JNF provides a broad spectrum of activities and is responsible for the forests in Israel including the trees, scenic trails, lookout points, recreation areas, bicycle paths, heritage and archeological sites and the afforestation, environmental, ecological and nature-based infrastructure of the lands of the State of Israel.

8.    For over a century, KKL-JNF has developed the land of Israel for a sustainable future, developing afforestation, supporting environmental education, advancement and activities, and strengthening the bond between the Jewish people and Israel. KKL-JNF is Israel's largest green organization and the oldest green organization in the world.

9.    Since 2018, the forests held and land owned by KKL-JNF have been subjected to extensive damage as a result of the rockets, incendiary terror balloons and kites launched from HAMAS controlled Gaza by HAMAS and/or others, with the aid, encouragement and support of Defendant USCPR. Specifically, from April 2018 until today, there have been hundreds of  fires resulting in damage to more than 9,550 dunam (approximately 2,400 acres) of KKL-JNF property caused by the rockets, incendiary terror balloons and kites launched from HAMAS controlled Gaza by HAMAS and/or others.  This has resulted in significant damages to the property owned or held by KKL-JNF and interfered with and has disrupted its business, operations, activities and the services which it provides to the public, who regularly visit, access and use the KKL-JNF forests including its trees, scenic trails, recreation areas, bicycle trails and the public areas and amenities provided and maintained by KKL-JNF for their use and enjoyment.

**Goodman Family**

10.    Plaintiff Asher Goodman is a United States citizen who lives in Sderot, Israel located within the Gaza Envelope with his wife and their three children. As a result of the fear and terror brought upon him and his family from the threat of, and exposure to, the rockets, incendiary terror balloons and kites launched from HAMAS controlled Gaza by HAMAS and/or others, Asher Goodman has suffered severe mental anguish and extreme emotional pain and suffering. Moreover, Asher along with members of the public have been denied the use and enjoyment of KKL-JNF forests and public areas including scenic trails, recreation areas, bicycle trails and public

areas and amenities provided by KKL-JNF for their use and enjoyment, as the rockets, incendiary terror balloons and kites have interfered with the public's health, safety and peace.

11.     Plaintiff Batsheva Goodman is a United States citizen who lives in Sderot, Israel located within the Gaza Envelope with her husband and their three children. As a result of the fear and terror brought upon her and her family from the threat of, and exposure to, rockets, incendiary terror balloons and kites launched from HAMAS controlled Gaza by HAMAS and/or others, Batsheva Goodman has suffered severe mental anguish and extreme emotional pain and suffering. Moreover, Batsheva along with members of the public have been denied the use and enjoyment of KKL-JNF forests and public areas including scenic trails, recreation areas, bicycle trails and public areas and amenities provided by KKL-JNF and others for their use and enjoyment, as the rockets, incendiary terror balloons and kites have interfered with the public's health, safety and peace.

**Rosenfeld Family**

12.     Plaintiff Ephriam Rosenfeld is a United States citizen who lives in Sderot, Israel located within the Gaza Envelope with his wife and their seven children. As a result of the fear and terror brought upon he and his family from the threat of, and exposure to, the rockets, incendiary terror balloons and kites launched from HAMAS controlled Gaza by HAMAS and/or others, Ephriam Rosenfeld has suffered severe mental anguish and extreme emotional pain and suffering. Moreover, Ephriam along with members of the public have been denied the use and enjoyment of KKL-JNF forests and public areas including scenic trails, recreation areas, bicycle trails and public areas and amenities provided by KKL-JNF and others for their use and enjoyment, as the rockets, incendiary terror balloons and kites have interfered with the public's health, safety and peace.

13.     Plaintiff A.R. is a United States citizen who lives in Sderot, Israel located within the Gaza Envelope with his parents and six siblings. A.R. is a minor born April XX, 20XX. As a result of the fear and terror brought upon him and his family from the threat of, and exposure to, the incendiary rockets, terror balloons and kites launched from HAMAS controlled Gaza by HAMAS and/or others, A.R. has suffered severe mental anguish and extreme emotional pain and suffering. Moreover, A.R. along with members of the public have been denied the use and enjoyment of KKL-JNF forests and public areas including scenic trails, recreation areas, bicycle trails and public areas and amenities provided by KKL-JNF and others for their use and enjoyment, as the rockets, incendiary terror balloons and kites have interfered with the public's health, safety and peace.

14.     Plaintiff B.R. is a United States citizen who lives in Sderot, Israel located within the Gaza Envelope with his parents and six siblings. B.R. is a minor born January XX, 20XX. As a result of the fear and terror brought upon him and his family from the threat of, and exposure to, the rockets, incendiary terror balloons and kites launched from HAMAS controlled Gaza by HAMAS and/or others, A.R. has suffered severe mental anguish and extreme emotional pain and suffering. Moreover, he along with members of the public have been denied the use and enjoyment of KKL-JNF forests and public areas including scenic trails, recreation areas, bicycle trails and public areas and amenities provided by KKL-JNF and others for their use and enjoyment, as the rockets, incendiary terror balloons and kites have interfered with the public's health, safety and peace.

15.     Plaintiff H.R. is a United States citizen who lives in Sderot, Israel located within the Gaza Envelope with her parents and six siblings. H.R. is a minor born September XX, 20XX. As a result of the fear and terror brought upon her and her family from the threat of, and exposure

to, the rockets, incendiary terror balloons and kites launched from HAMAS controlled Gaza by HAMAS and/or others, H.R. has suffered severe mental anguish and extreme emotional pain and suffering. Moreover, H.R. along with members of the public have been denied the use and enjoyment of KKL-JNF forests and public areas including scenic trails, recreation areas, bicycle trails and public areas and amenities provided by KKL-JNF and others for their use and enjoyment, as the rockets, incendiary terror balloons and kites have interfered with the public's health, safety and peace.

**The Vaknin Family**

16.     Plaintiff Bracha Vaknin is a United States citizen who lives with her husband and their five children in the Netivot region of Israel located within the Gaza Envelope. As a result of the fear and terror brought upon her and her family from the threat of, and exposure to, the rockets, incendiary terror balloons and kites launched from HAMAS controlled Gaza by HAMAS and/or others, Bracha Vaknin has suffered severe mental anguish and extreme emotional pain and suffering.  Moreover, Bracha along with members of the public have been denied the use of and enjoyment of KKL-JNF forests and public areas including scenic trails, recreation areas, bicycle trails and public areas and amenities provided by KKL-JNF and others for their use and enjoyment, as the rockets, incendiary terror balloons and kites have interfered with the public's health, safety and peace.

17.     Plaintiff S.M.V. is a United States citizen who lives in the Netivot region of Israel with his parents and five siblings. S.M.V. is a minor born April XX, 20XX. As a result of the fear and terror brought upon him and his family from the threat of, and exposure to, the rockets, incendiary terror balloons and kites launched from HAMAS controlled Gaza by HAMAS and/or others, S.M.V. has suffered severe mental anguish and extreme emotional pain and suffering.

Moreover, he along with members of the public have been denied the use and enjoyment of KKL-JNF forests and public areas including scenic trails, recreation areas, bicycle trails and public areas and amenities provided by KKL-JNF and others for their use and enjoyment, as the rockets, incendiary terror balloons and kites have interfered with the public's health, safety and peace.

18.     Plaintiff E.V. is a United States citizen who lives in the Netivot region of Israel with his parents and five siblings. E.V. is a minor born January XX, 20XX. As a result of the fear and terror brought upon him and his family from the threat of, and exposure to, the rockets, incendiary terror balloons and kites launched from HAMAS controlled Gaza by HAMAS and/or others, E.V. has suffered severe mental anguish and extreme emotional pain and suffering. Moreover, he along with members of the public have been denied the use and enjoyment of KKL-JNF forests and public areas including scenic trails, recreation areas, bicycle trails and public areas and amenities provided by KKL-JNF and others for their use and enjoyment  , as the rockets, incendiary terror balloons and kites have interfered with the public's health, safety and peace.

19.     Plaintiff M.V. is a United States citizen who lives in the Netivot region of Israel with her parents and five siblings. M.V. is a minor born April XX, 20XX. As a result of the fear and terror brought upon her and her family from the threat of, and exposure to, the rockets, incendiary terror balloons and kites launched from HAMAS controlled Gaza by HAMAS and/or others, M.V. has suffered severe mental anguish and extreme emotional pain and suffering. Moreover, she along with members of the public have been denied the use and enjoyment of  KKL-JNF forests and public areas including  scenic trails, recreation areas, bicycle trails and  public areas and amenities provided by KKL-JNF and others for their use and enjoyment , as the rockets, incendiary terror balloons and kites have interfered with the public's health, safety and peace.

20. Plaintiff S.R.V. is a United States citizen who lives in the Netivot region of Israel with her parents and five siblings. S.R.V. is a minor born September XX, 20XX. As a result of the fear and terror brought upon her and her family from the threat of, and exposure to, the rockets, incendiary terror balloons and kites launched from HAMAS controlled Gaza by HAMAS and/or others, S.R.V. has suffered severe mental anguish and extreme emotional pain and suffering. Moreover, she along with members of the public have been denied the use and enjoyment of KKL-JNF and public forests including scenic trails, recreation areas, bicycle trails and public areas and amenities provided by KKL-JNF and others for their use and enjoyment, as the rockets, incendiary terror balloons and kites have interfered with the public's health, safety and peace.

21. Plaintiff A.V. is a United States citizen who lives in the Netivot region of Israel with her parents and five siblings. A.V. is a minor born June XX, 20XX. As a result of the fear and terror brought upon her and her family from the threat of, and exposure to, the rockets, incendiary terror balloons and kites launched from HAMAS controlled Gaza by HAMAS and/or others, A.V. has suffered severe mental anguish and extreme emotional pain and suffering. Moreover, she along with members of the public have been denied the use and enjoyment of KKL-JNF forests and public areas including scenic trails, recreation areas, bicycle trails and public areas and amenities provided by KKL-JNF and others for their use and enjoyment, as the rockets, incendiary terror balloons and kites have interfered with the public's health, safety and peace.

## II.    The Defendant

22. Defendant Education for a Just Peace in the Middle East is a non-profit corporation with 501(c)(3) status granted by the Internal Revenue Service, and which is organized under the laws of the District of Columbia, with Federal Tax ID number 42-1636592. It was incorporated in 2004 and granted 501 (c)(3) status in that name that same year. It presently also operates and

does business in the District of Columbia and elsewhere in the name of and as the US Campaign for Palestinian Rights ("USCPR").

23.     USCPR is an active sponsor of and participant in a planned campaign and conspiracy to damage the Plaintiff, Keren Kayemeth-LeIsrael–Jewish National Fund, and sponsors the "STOP THE JNF CAMPAIGN". This planned campaign and conspiracy is designed to damage, destroy and interfere with the business and operations, the reputation and international standing of KKL-JNF.

24.     Defendant USCPR provides material support to, and sponsors the BDS National Committee ("Boycott National Committee" or "BNC") by, *inter alia* collecting money in the United States for and on behalf of the BNC.  As explained below, the Boycott National Committee is comprised of, among others, five US designated terror organizations: HAMAS, the Popular Front for the Liberation of Palestine ("PFLP"), the Popular Front-General Command, Palestinian Islamic Jihad ("PIJ"), and the Palestinian Liberation Front.  USCPR raises money in the United States for, and transmits monies from the United States to the BNC, which directly and indirectly benefits HAMAS and other designated terror organizations, in violation of applicable US law.

25.     In addition, since 2018, the Defendant USCPR has conspired to support, promote and encourage the Great Return March ("GRM"), which has been held in HAMAS controlled Gaza being led, sponsored, supported and directed by US-designated terror organizations. Since the start of the Great Return March, the Defendant has been actively promoting and sponsoring the GRM, from which launchings of incendiary terror balloons, kites and other terror devices have been and are being used to attack the lands of the State of Israel, and its citizens, including the Plaintiffs named herein; and is promoted on its Facebook page, on Twitter, and in emails.

26.     USCPR maintains offices in this District at 1736 Columbia Road, NW, Washington DC  20009. The Registered Agent for USCPR is Andrew Kadi, 3601 Wisconsin Avenue, NW, Washington, DC 20016.

## FACTUAL ALLEGATIONS

### Historical Background

27.     Since the adoption by the United Nations of the UN Partition resolution in November, 1947, which envisioned the creation of a Jewish State and an Arab State, and the subsequent declaration of the independence of the State of Israel on May 14, 1948, which was immediately recognized as a sovereign state by the United States of America and subsequently admitted as a full member-state of the United Nations, several Arab states and Palestinian terror groups have fought wars with Israel, rejected its right to exist and sought to destroy its very existence.  These Palestinian terror groups have used every means available, including, but not limited, to war, suicide bombings, kidnappings, hijackings, economic and academic boycotts, and the launching of rockets and other attack devices into and within the sovereign State of Israel.

28.     Following the signing of the Oslo Accords between Israel and the Palestine Liberation Organization ("PLO"), the Palestinian National Authority ("PA") was created, which was given quasi-governmental responsibility for the administration of certain areas of land located in the West Bank of the Jordan River and in Gaza.

29.     The Arab-Palestinians radical rejectionist terror groups HAMAS, PFLP, PIJ, and others have not recognized Israel as a sovereign nation-state.

30.     To counter the peace negotiations accepted by the PLO that led to the creation of the PA, these violent rejectionist groups banded together with others to form a rejectionist terror

front, which continues to this day, against the peace process, against Israel and against people residing in and visiting in the State of Israel.

31.     Since September 2000, the Israeli-Palestinian conflict has been dominated by Palestinian violence and organized terrorist attacks, many acts of which have been perpetrated by HAMAS.  During the period 2000-2005, Palestinian terror organizations launched multiple suicide bombings and other attacks of heinous murder, resulting in more than a thousand Israelis and Americans killed and many thousands more wounded over the course of this devastating period, commonly referred to as the "Second Intifada" or the "Al Aqsa Intifada."

### Background on Gaza

32.     In 2005, Israel unilaterally withdrew from Gaza, leaving it under the control of the PA. The following year, the PA and HAMAS agreed to a short-lived national unity government to govern the area of Gaza under PA authority. In 2007, HAMAS took over Gaza by force of arms and violence and the PA withdrew from Gaza.  HAMAS has continued to be in total control of Gaza since that date.

33.     HAMAS continues to engage in terrorist activity, and indeed it prioritizes militancy over other activities at the expense of Gaza's civilian population, in accordance with its covenant and commitment to reject and eliminate Israel as a sovereign nation-state.  Its various militant components do not always wear military-type uniforms, especially when fighting in civilian populations so as to blend in with the local population and effectively use residents as human shields.

## HAMAS – The Islamic Resistance Movement

### HAMAS' Founding and Structure

34.　　HAMAS was founded in December 1987 by Sheikh Ahmed Yassin together with Salah Shehada, Abd al-Aziz al-Rantisi, Muhammad Sham'a, Ibrahim al-Yazuri, Issa al-Nashar and Abd al-Fatah Dukhan.

35.　　HAMAS is committed to the globalization of Islam through violent "Jihad", which means "holy war".

36.　　HAMAS is nominally divided into three interconnected wings: a political organization, the "Da'wa" (HAMAS' social service or humanitarian component), and a military operational wing known as the Izz-al-Din al-Qassam Brigades.  Although these components have separate responsibilities, the HAMAS organization operates seamlessly, with each component working together to conduct and support the military operations and achieve the illegal objectives of the terrorist group as a whole.

37.　　The HAMAS political documents call for an Islamic Palestinian state throughout and in place of Israel by eliminating the State of Israel through violent jihad. HAMAS is extremely anti-American and rejects achieving a peaceful resolution between Israel and the Palestinians.

38.　　Through its military wing, Izz ad-Din al-Qassam Brigades, HAMAS commits criminal activity, including murder, attempted murder, solicitation to commit murder, and numerous other acts of international terrorism, as defined by 18 U.S.C. § 1331, in violation of the criminal code of the United States.

39.　　From 1999 until today, courts of the United States, including this Court, have held HAMAS responsible for terrorist attacks in which American and Israeli citizens were killed or injured.

40.     In 2005, Israel unilaterally withdrew its military and relocated all Israeli citizens who had been living in Gaza, turning Gaza over to the PA.

41.     In the Palestinian Legislative Council elections held in 2006, HAMAS won by a large majority of the Legislative Council votes. Since the elections, HAMAS has aimed to establish its standing as leader of the Palestinians.

42.     In 2007, HAMAS, the designated foreign terrorist organization, carried out a violent military coup in Gaza and forcibly drove the PA from ostensible power in Gaza.

43.     Since the violent takeover, HAMAS has retained complete control of Gaza and continues to control every aspect of life in Gaza.

44.     HAMAS does not allow any political dissent. HAMAS is well known for imprisoning dissenters.

45.     HAMAS also imprisons people in Gaza over their social media posts; HAMAS actively monitors social media and other electronic platforms in Gaza and they know about nearly everything going on online in Gaza.

46.     In addition to pervasive monitoring, HAMAS regularly tortures detainees to gain information. HAMAS subjects prisoners to intense physical torture in order to force people to give up their friends, their social media passwords (which HAMAS then uses to watch their network and future activity), and anyone else that HAMAS considers a political threat.

47.      HAMAS routinely violates treaties such as the PA's 2014 signing of the Convention against Torture.

48.     HAMAS works in full cooperation at many levels with the other Gaza-based Foreign Terror Organizations. There is little to nothing that happens in Gaza that HAMAS does not know about, approve and support as it is in total control of Gaza.

49.     Since its violent coup in which it gained control over Gaza, thousands of rockets have been launched into Israel by HAMAS and others, causing loss of life and destruction of property.  Terror tunnels have been dug by HAMAS and others under fences in Gaza in order to infiltrate the State of Israel and to commit attacks upon Israeli citizens and the many American and other visitors to and residents of Israel.

50.     Under HAMAS' rule, rocket fire aimed at the State of Israel from Gaza dramatically increased to such a degree that three counter-terror military operations (2008-2009, 2012, and 2014) were carried out by Israel to halt the rocket launches.  Moreover, HAMAS regularly and repeatedly violates cease fires reached or brokered by others with Israel.

51.     For years, the terror weapon of choice for HAMAS from Gaza, was the launching of rockets from Gaza into the Gaza Envelope. Since approximately 2010, it is estimated that HAMAS and others have launched more than 9,800 of rockets and mortars from HAMAS controlled Gaza into the Gaza Envelope. The property, land and forests owned and/or held by KKL-JNF have been subjected to extensive damage as a result of those rockets.

52.     Beginning in March 2018 and continuing until today, a new form of terror has been initiated from the HAMAS controlled Gaza by HAMAS and others; launching incendiary devices against Israel's citizens located in the Gaza Envelope. These incendiary devices are comprised of kites and balloons equipped with flammable materials and/or incendiary and/or explosive devices.



<u>Ezzadin al-qasam</u>, Flaming kite caused enormous loses in a Wearhouse belongs to the settlers, published 04/22/18 "…*And the introduction of the "kites" in the popular resistance was aimed at the keeping the occupation snipers who kill the Palestinian protestors "busy", but that has evolved to keeping the occupation authorities "busy" on more than one level, as some who are behind this new means of resistance say.*"



 Izz ad-Din al-Qassam Brigades, HAMAS military wing, published April 19, 2018 Title: "[Burning] Kite starts a fire in the fields of the [Israeli] settlements surrounding Gaza Strip"



 Izz ad-Din al-Qassam Brigades, HAMAS military wing, *Since the start of the Great Return March on March 30, Palestinian youths have been firing incendiary kites with incendiary torches on almost a daily basis towards our occupied territories east of the Gaza Strip, which caused heavy losses to the occupation*."  May 5, 2018

53.     On November 30th, 2018, the United States put forward a precedent-setting resolution at the UN General Assembly condemning HAMAS and other militant groups in Gaza for repeatedly firing rockets into Israel, for carrying out other violent activities, such as launching incendiary balloons, and the use of civilian infrastructure for militant activities and more.

54.     These new weapons of incendiary terror are designed, launched and intended to, *inter alia*, terrorize the civilian population in the Gaza Envelope, inflict significant property damage, interfere and cause damage to businesses, open space, farmland and forests; and interfere with the use and enjoyment of the land, forests, scenic trails, recreation centers and public amenities, and interfere with the public's health, safety and peace. These incendiary terror launchings have caused significant damage to the properties of KKL-JNF and property and/or the mental health and/or living conditions of the Individual Plaintiffs, all to their damage.

55.     Since April, 2018 until today, over 4800 acres of Israeli land, including the land and forests owned and/or held by KKL-JNF, have been burned by the thousands of rockets,

incendiary terror balloons and kites launched from HAMAS controlled Gaza by HAMAS and/or others, which has caused damage to KKL-JNF and some of the individual Plaintiffs.

56.     As part of its campaign of terror, HAMAS converts child-friendly balloons and kites into weapons of terror, including through the use of gasoline, helium, and other products for humanitarian use but which have been converted into and become tools of and fuel for terror.

57.     HAMAS routes significant sums that it nominally collects for charitable and humanitarian purposes to terrorist and other operational uses.  Even the funds utilized for charitable purposes free up other funds for specific terrorist acts.  HAMAS used (and still uses) funds purportedly collected for charitable purposes to, among other things, provide weapons, explosives, the building of terror tunnels, transportation services, safehouses, training and salaries for its terrorist operatives and for terrorist recruiters.  Funds used for HAMAS charitable purposes directly support its military operations, including the launching of rockets and incendiary terror offensive.  They also support HAMAS' propaganda activities, which increases its fundraising and attracts terror activists as recruits.

58.     HAMAS has and continues to knowingly, willfully, and unlawfully combine, conspire, confederate and has agreed to commit numerous acts of international terrorism, as defined by 18 U.S.C. §§ 2331 and 2332, including acts of murder, attempted murder, solicitation to commit murder, assaults, attempted assaults as well as  providing material support to  other designated Foreign Terrorist Organizations.

## HAMAS' Formal Designation as a Terrorist Organization

59.     In 1989, the Government of Israel declared HAMAS a terrorist organization and designated it an "unlawful organization" because of its terrorist acts.  Notice of the designation was placed in the official Government of Israel publication, the Announcements and Advertisements Gazette.

60.     On January 23, 1995, President Clinton issued Executive Order No. 12947, which found that "grave acts of violence committed by foreign terrorists that threaten to disrupt the Middle East peace process constitute an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States."

61.     Executive Order No. 12947 designated HAMAS a Specially Designated Terrorist ("SDT") and blocked all of its property and interests in property.

62.      On October 8, 1997, by publication in the Federal Register, the United States Secretary of State designated HAMAS a Foreign Terrorist Organization pursuant to Section 219 of the Immigration and Nationality Act and the Antiterrorism and Effective Death Penalty Act of 1996.  The designation of HAMAS as an FTO has been renewed every two years since 1997.

63.     After the September 11, 2001 terrorist attacks on the United States, President Bush issued Executive Order No. 13224, declaring a national emergency with respect to the "grave acts of terrorism ... and the continuing and immediate threat of further attacks on United States nationals or the United States."

64.     Executive Order No. 13224 designated HAMAS a Specially Designated Global Terrorist ("SDGT").  That Executive Order also blocked all property and interests in property of SDGTs, including HAMAS.

## **Palestinian National and Islamic Forces ("PNIF")**

65.     In the fall of 2000, the Second Intifada was launched against Israel by HAMAS and other terror organizations. Large riots and widespread violence erupted with Palestinians carrying out bus bombings and suicide attacks throughout Israel. Shortly after the outbreak, under the authorization of Yasser Arafat and the leadership of terrorist Marwan Barghouti, the Palestinian National and Islamic Forces (PNIF) was formed as a coalition with the purpose of coordinating the agenda of its members and planning and executing joint attacks against Israel.

66.     PNIF is a coordinating framework for a number of Palestinian national and religious factions, including five designated terrorist organizations; to wit, HAMAS, PFLP, PLF, PIJ and PFLP.  Founded in 2000, its purpose was to lead and coordinate terrorist activities between its various member organizations at the onset of the "Second Intifada" terror campaign, resulting in more than a thousand Israelis and Americans killed and many thousands more wounded over the course of this devastating period. The coalition was and remains an actual body of representatives from these member organizations, with an official logo and official declarations.

67.     To this day, terror organizations inside PNIF, including HAMAS, play a critical leading role in its operations, philosophy, strategic planning and implementation of terror activities against Israel and the Jewish people who reside in and visit Israel. PNIF is divided on the regional level between the West Bank and Gaza with various committees on the district level.

68.     In Gaza, the regional PNIF committee, often referred to as the Monitoring Committee, is led by Khaled al-Batsh, senior leader of the designated PIJ. Ismail Radwan, HAMAS senior leader, is also a member of PNIF's monitoring committee.

69.     On the governate level, PNIF in Gaza is divided into 4 districts, each with its own PNIF committee: Rafah, Khan Younes, North of Gaza and Middle of Gaza.

## The BNC and its Ties to HAMAS and other Terrorists

70.     During the Second Intifada, Palestinian leadership adopted further strategies to embolden their resistance against Israel, including the enhanced strategy of boycotting Israel both economically, academically and diplomatically as an integral part of its campaign of terror.

71.     PNIF, in several official published statements called for Palestinian civil society "to reinforce national directives to boycott Zionist Israeli and American products and especially to boycott normalization projects" and for leaders to "sever all political and economic ties with the Israeli enemy."

72.     PNIF not only called on civil society institutions and organizations to boycott but also expressed its desire to partner with them to integrate them into the use of terror. Collaboration between PNIF and civil society institutions was a strategic decision made by PNIF to expand the use of terror and gain widespread popular support.

73.     On July 9, 2005, one hundred seventy plus Palestinian political parties, unions, associations, coalitions and organizations, representing "Palestinian refugees, Palestinians under occupation and Palestinian citizens of Israel," in furtherance of their planned campaign of terror against Israel, endorsed the Boycott Divestment and Sanctions Call ("BDS Call").

74.     In the months and years following the BDS Call, Palestinian civil society activists and pro-Palestinian activists abroad, began meeting to organize and formalize the BDS campaign globally as another means of terror against Israel.

75.     PNIF backed the BDS Call and facilitated its acceptance by major sectors of Palestinian civil society within the West Bank and globally.

76.     In April 2008, the Boycott National Committee was established "as the Palestinian coordinating body for the BDS campaign worldwide…" with the role of strengthening and

spreading "boycott as a central form of civil resistance." However, the real purpose of the Boycott movement is the elimination of Israel as a sovereign nation-state.

77.     Since the founding in 2008 of the BNC, which includes Foreign Terror Organizations, PNIF has been a leading member of the BNC, steering its vision and agenda.

78.     PNIF's involvement in the BNC and its significance goes beyond paper and its listing as the first member coalition in the BNC. PNIF propelled the boycott strategy back in 2000 and pushed the BDS Call to the "higher ups" in 2005. PNIF is the official representation of all the political national and Islamic factions, without which the BNC would not have the power it has gained in pushing its agenda to use BDS as another form of terror in its quest to remove Israel as a sovereign state and to remove the Jewish people from the lands of Israel. More than once, the BNC itself referred to PNIF as a "key player" or "main pillar" inside the BNC.

79.     PNIF itself has stated that the BDS campaign against Israel is part of the Palestinian national strategy against Israel.

80.     There is also a PNIF representative on the BNC Secretariat and there is a significant overlap in PNIF/BNC personnel, as the organizations are intertwined and unified in their commitment to terrorize and demonize Israel.

**Palestinian National and Islamic Forces (PNIF), the lead coalition member of the BDS National Committee (BNC), and HAMAS**

81.     HAMAS is one of the most prominent actors within PNIF in Gaza. Senior HAMAS figures have served as representatives of the PNIF since its inception.

82.     A senior HAMAS official in PNIF was Said Siyam, the Minister of Interior who was responsible for founding HAMAS' operational security force in Gaza.

83.     Today, Ismail Radwan, a senior HAMAS figure, serves as the representative of HAMAS in PNIF. Radwan was formerly a minister in the HAMAS government and a

spokesperson for the terror organization. He also serves as Deputy Chairman of the Board of Directors of HAMAS's Al-Aqsa Network.

84.     Radwan is one of the most prominent spokespeople for the HAMAS riots on the Gaza border known as the Great Return March(es), which began in March 2018. Radwan, in epitomizing the essence of the Palestinian terror organizations who are committed to resisting the very existence of, and normalization of relations with, Israel stated (November 2018): "**Those cowards who coordinate and cooperate [with the State of Israel], and those who normalize [relations] with the occupation – they will burn in hell with the apes and pigs. Do you know who the apes and pigs are? They are the Jews, who God transformed into apes and pigs**."

85.     Moreover, Radwan participated in the Islamic Unity Conference held in Tehran (November 2018), in which he referred to Iranian aid, saying: "Thank you very much to Iran, which has supported and continues to support the resistance politically, materially, militarily and in the media."

### The Great Return March, GRM Supreme National Committee and the Launchings of the Incendiary Terror Balloons and Kites

86.     March 2018 marked the beginning of what has now become known as the Great Return March. While many believe this to be a popular "peaceful" protest at the Gaza-Israel border, it is in fact a violent uprising being led and guided by US-designated terror organizations.

87.     The Great Return Marches are sponsored and supported by HAMAS and include organized efforts to terrorize Israel and those that reside in Israel, to sabotage Israel's border fence, plant explosive charges, and launch incendiary terror balloons and kites toward Israeli communities to burn the forests, parks, and farmlands on the Israeli side of the border and to terrorize the people and citizens of Israel, including the Plaintiffs.

88.     In March 2018, PNIF created the governing body of the Great Return March – the "Supreme National Committee", following a series of meetings between PNIF representatives and (smaller) Palestinian organizations. According to PNIF's coordinator in Gaza, Khaled Al-Batsh – the "Supreme National Committee of the GRM" was formed with the agreement of HAMAS, the Palestinian Islamic Jihad, PFLP and the rest of the Palestinian organizations.

89.     Ismail Radwan, HAMAS senior leader, and member of PNIF, is a member of the GRM Supreme National Committee.

90.     Khaled Al-Batsh, senior member of the PIJ, and leader of PNIF in Gaza, is a coordinator of the GRM Supreme National Committee.

91.     Maher Mezher, PFLP Central Committee member and a PFLP representative in PNIF, is a member of the GRM Supreme National Committee.

92.     In March 2018, Ismail Haniyeh a senior political leader of HAMAS congratulated the GRM participants and said that "the occupation will cease to exist". A few months later, in May 2018, Haniyeh said that HAMAS and the rest of the Palestinian factions are part of the Great Return March.  He also met with the GRM Supreme National Committee.

93.     Following the first week of the Great Return March, PNIF's monitoring committee, together with the GRM Supreme National Committee, announced the plans for future marches.

94.     In February 2019, PNIF's monitoring committee approved the continuation of the Great Return March.

95.     In July 2019 the GRM Supreme National Committee organized a meeting that included PNIF and all the Palestinian factions to discuss ways to further develop the Great Return March.

96.     Many members of HAMAS senior leadership have participated in and spoken at Great Return Marches.

97.     The head of HAMAS in Gaza, Yahya Al-Sinwar participated in the Great Return March and said that the marches will continue until goals are achieved.

98.     HAMAS, in a press release from July 2019, called "on the Palestinian people to follow the decisions of and participate in the activities organized by the Supreme National Committee of the Great March of Return."

99.     Within HAMAS controlled Gaza, there are several terrorist organizations which are launching the incendiary terror balloons and kites, which are being funded and directed by the Foreign Terror Organizations that comprise the GRM Supreme National Committee.

100.    One group of terrorists that launch incendiary terror balloons call themselves the Sons of al-Zawari in Rafah, located in Gaza. They claim they await and take orders from the GRM Supreme National Committee.

101.    The "Sons of al-Zawari" is a group named after HAMAS's Al Qassam Brigade's Tunisian aeronautical engineer, Mohammad Al Zawari. Before his death, Mohammad Al Zawari helped build and operate attack drones for HAMAS and Hezbollah. Sons of al-Zawari are organized by geographical location in Gaza and there appears to be 5 different units: Rafah, Khan Younes, Maghazi, Middle and North of the strip.

102.    The Sons of al-Zawari, who frequently take credit for launching incendiary terror balloons, post pictures and videos to their Facebook page of members filling balloons and declaring their intention to burn Israeli land, which includes the forests of Plaintiff KKL–JNF, and have logos depicting incendiary terror balloons alongside a Palestinian flag, kite, or rifle.



103. Beyond being named after the HAMAS military engineer, there is other evidence that the Sons of al-Zawari are part of HAMAS. On one Sons of al-Zawari Facebook page, there is a video of al-Zawari's widow wearing an Al-Qassam Brigades (the military wing of HAMAS) headband while she thanks the Sons of al-Zawari and Al-Qassam Brigades for their terror attacks on Israel. Further, the Al-Qassam Brigades held a memorial ceremony to honor a member of the Sons of al-Zawari unit. At the ceremony there were Sons of al-Zawari members holding incendiary terror balloons and kites with Arabic messages on them, similar to the incendiary terror balloons and kites that have been launched at the KKL-JNF forests and properties in Israel, behind an Al-Qassam Brigades member who was leading the ceremony.

104. Further, the Al-Qassam Brigades held a memorial ceremony to honor Muhammad Al-Humaideh, a member of the Sons of Al-Zawari unit, and a picture of the ceremony was published on Facebook.



105.    Beyond directing the orders and funding the Sons of al-Zarawi as well as other units, the GRM Supreme National Committee (and PNIF) themselves supported the launchings of the incendiary terror balloons and kites, and specifically the Sons of al-Zarawi, posting photos and videos from their official Facebook page.







106.    Since March 2018 it is believed there have been 82 organized Great Return Marches.

107.    As the Great Return Marches are conducted in HAMAS controlled Gaza, the GRM and its activities, including the launching of incendiary terror balloons and kites, cannot occur without the express support, permission, consent and control of HAMAS.

30

108.     Since the Marches began, there have been upon information and belief over 600 documented launches of incendiary terror balloons and kites into the Gaza Envelope causing damage to the Individual Plaintiffs and KKL-JNF as they have interfered with the public's health, safety and peace and with the business operations and activities of KKL-JNF, and with regard to its providing of environmental and ecological infrastructure, public amenities and access to the trees, forests, scenic trails, bicycle trails and other aspects of KKL's maintenance of these public access properties for the use and enjoyment of millions of people, which said properties are accessible to Israelis and others living in or visiting in the State of Israel.

109.     The incendiary terror balloons and kites have caused tens of millions of dollars in damage to KKL-JNF. The incendiary terror balloons and kites have burned trees and forests, destroyed scenic and bicycle trails, devastated the environmental and ecological infrastructure of KKL-JNF lands, destroyed fields of crops, caused blackouts in Israeli towns, and force people living in Israel to live under a constant fear of terror. People, such as the Goodman, the Rosenfeld, and the Vaknin families can no longer permit or risk their children playing with balloons and kites, fully depriving them of that joy and disrupting their lives as instead, they must be afraid of every flying object.

110.     Most of the terror fires caused by the incendiary terror balloons and kites launched from HAMAS controlled Gaza have occurred near or in the Israeli communities in the Gaza Envelope, burning trees, agricultural fields, forests and nature preserves including those owned by KKL-JNF, all to its damage.

111.     Arson terrorism also has contributed to the disruption of the enjoyment of daily life in the local Israeli communities and has caused moral and psychological damage, including

damage to the individual Plaintiffs who are engaged in or in need of treatment due to the trauma they have suffered, all to their damage.

### BNC's Knowledge and Support of Terrorist Launchings at the GRM

112.     The BNC is integrally involved in the GRM.

113.     In April 2018, BNC secretariat member, Majida Al-Masri, announced that one of the Friday GRM marches would be dedicated to boycotting Israel.

114.     In late November of 2018, the GRM Supreme National Committee officially called for an international campaign for the military embargo on Israel. The GRM Supreme National Committee asked BDS activists, as well as NGOs and human rights organization to take part in the campaign.

115.     Furthermore, the GRM Supreme National Committee called for Friday marches on January 4th of 2019 under the title of "Fighting the Normalization". The GRM Supreme National Committee confirmed its position for a complete boycott of the State of Israel.

116.     BNC members have also actively participated in and supported the Great Return March, including, but not limited to:

a.     Abdulrahman Abu Nahel, BNC's Gaza coordinator, appeared the Great Return March, heeding the message of the BNC, holding signs calling for a military embargo on Israel.



b.      Haidar Eid, BNC member in Gaza, has supported and attended the Great Return March several times. In an interview about the Great Return March, Eid said that the "*BNC supports all kinds of popular resistance against the occupation."*

c.      Omar Barghouti, co-founder of the BNC, supports the Great Return March.

d.      In addition, in marking the one year anniversary of the GRM, BNC published on March 29, 2019 on Facebook, its support of the GRM.



117.    Furthermore, "Israel Apartheid Week" (IAW) 2019, an annual global event with which the BNC is intrinsically intertwined, featured kites and the GRM in 2019. BNC International Campaigns Coordinator, Ana Sanchez, is the contact person for the event and many BNC members are also on the IAW Coordinating Committee like Michael Deas and Rafeef Ziadeh.



118.    The BNC is integrally involved with the GRM. The GRM is not a peaceful protest, and as clearly demonstrated herein, is an organized, violent gathering sponsored and supported by HAMAS, and other terrorist organizations, intended to sabotage Israel's border fence, plant explosive charges, and launch incendiary terror balloons and kites toward Israeli communities to burn the trees, forests, parks, and farmlands on the Israeli side of the border and to terrorize the people and citizens of Israel.

119.    BNC knew and knows that the incendiary terror balloons and kites are launched during GRM, and therefore, by promoting and supporting the GRM, the BNC materially supports and sponsors these acts of trespass, public nuisance and terror upon the people and property of Israel, including the Plaintiffs.

**USCPR's Support of BNC**

120.    Defendant Education for Just Peace in the Middle East is believed to have been initially created in 2001 as a Palestine focused project called the US Campaign to End the Israeli Occupation within the Center for Economic and Social Rights.

121.    In 2016, Defendant began doing business as the US Campaign for Palestinian Rights.

122.    Once the BNC was founded in 2008, Defendant became a major partner with the BNC.

123.    As of at least November 2017, USCPR served as the US-based fiscal sponsor for the BNC. The BNC, which is not a US tax exempt organization but is rather a foreign entity consisting of US designated Foreign Terror Organizations, each of whom are barred from receiving funds in or from the United States, updated its "Donate" page to allow US donors to claim tax deductions for allegedly making tax-exempt donations to, and receipts were given from, USCPR under its legal name, Education for Just Peace in the Middle East.



124.    Upon making a donation, one will receive an email stating in pertinent part:

> "This is a receipt for your kind donation to the Palestinian BDS
> National Committee, the broadest coalition in Palestinian civil
> society that leads the global BDS movement for Palestinian rights."

125.    In addition, the email continues to state that the Defendant is the fiscal sponsor of the BNC. Specifically, the email states in pertinent part:

> "For your records, the Palestinian BDS National Committee (BNC)
> is fiscally sponsored by Education for Just Peace in the Middle East,
> which is registered as a 501(c)3 charitable organization."

126.    Lastly, the email provides the EIN of the Defendant as the fiscal sponsor of the BNC. Specifically, the email states in pertinent part: "Our fiscal sponsor's EIN is 42-1636592."

127.    Beyond the direct fiscal sponsorship, USCPR also sponsored and provided material support to the BNC in other ways.

128.    The USCPR works closely with the BNC representative in North America.

129.    There are also personnel connections between the BNC and USCPR. Nasser Barghouti, the brother of BNC founder and Secretariat member, Omar Barghouti, is USCPR's Treasurer and member of USCPR's steering committee.

130.    In addition, the BNC and USCPR mutually support each other and view each other as critical "partners" and collaborators. BNC founder and secretariat member, Omar Barghouti, stated that USCPR "is simply the BNC's most important strategic ally and partner in the U.S."

131.    The BNC itself also put out a statement describing the importance of USCPR.

> The US Campaign to End the Israeli Occupation and its member organizations are at the very heart of the incredibly exciting development of BDS in the US that has taken place in recent years. Thanks to their tireless efforts, BDS is approaching a tipping point in the U.S., from university campuses, academic associations and faith communities to national trade unions and even U.S. presidential debates. …As Palestinians continue to take to the streets and engage in mass popular resistance for dignity and liberation, we are heartened to have **strategic partners such as the US Campaign to work with…**

36

(emphasis added)

### **USCPR's Support of GRM**

132.    Since the start of the Great Return March, USCPR has been actively promoting and sponsoring the Great Return Marches on its Facebook page, on Twitter, in emails, and otherwise.







133.     Jehad Abusalim, speaker at USCPR's 2018 National Conference, lauded the Great

Return March and its rioters on a panel at the conference.

134.     Yousef Munayyer, USCPR's Executive Director, tweeted opposition to Israel's

use of force in response to "burning kites and balloons."



135.     Defendant USCPR and its agents, employees and representatives knew that

during the GRM, incendiary terror balloons and kites were being used and launched into Israel

and toward communities to burn the forests, parks, and farmlands on the Israeli side of the border

and to terrorize the people and citizens of Israel; and encouraged and supported the Great Return

Marches as part of its campaign and conspiracy to support the Boycott National Committee, which consists of Foreign Terror Organizations, and to provide financial support to the BNC, in violation of US law prohibiting US citizens from contributing to Foreign Terror organizations, including those who make up both the BNC and PNIF, which together support and sponsor the GRMs and other acts of international terror, all to the damage of the Plaintiffs, and each of them.

136.    The Defendant supports and sponsors the GRM, knowing that the GRM is not a peaceful protest, and as clearly demonstrated herein, is an organized, violent gathering sponsored and supported by HAMAS, and other terrorist organizations, intended to sabotage Israel's border fence, plant explosive charges, and launch incendiary terror balloons and kites toward Israeli communities to burn the forests, parks, and farmlands on the Israeli side of the border and to terrorize the people and citizens of Israel.

137.    The Defendant knew and knows that the incendiary terror balloons and kites are launched during the GRM, and therefore, by promoting and supporting the GRM, the Defendant materially supports and sponsors these acts of trespass, public nuisance and terror upon the people and property of Israel, including the Plaintiffs, and is liable to the Plaintiffs, and each of them, for all the damages caused by the acts of the Defendant.

### USCPR has Specifically Targeted Plaintiff KKL-JNF with the Stop the JNF Campaign

138.    In addition to its active support of the BNC and the GRM, the USCPR has also directly interfered with, and attempted to destroy the business, assets, operations of Plaintiff KKL-JNF.

139.    Since 2009 and continuing until today, the BNC, USCPR and/or others have promoted and participated in an international campaign directly targeting Plaintiff KKL-JNF under the "Stop the JNF Campaign", all to the damage and detriment of Plaintiff KKL-JNF.

39



140.   In describing the campaign, the Stop the JNF Campaign website states:

> **History of the campaign**
>
> The first meeting to build the Stop the JNF campaign was held in Geneva in May 2009,
> during the World Conference Against Racism/Durban Review and the shadow Israel
> Review Conference. Plans to build the campaign were started at this meeting with the
> Habitat International Coalition (HIC), the International Jewish Anti-Zionist Network
> (IJAN), the Palestinian Boycott, Divestment and Sanctions National Committee (BNC), the
> Scottish Palestine Solidarity Campaign (SPSC).
>
> In May, 2010, these organizations co-sponsored an organizing meeting in Edinburgh,
> Scotland, for activists and lawyers who were already building campaigns against the JNF
> in their regions. The goal of the meeting was the development and international
> coordination of campaigns against the Jewish National Fund (JNF).

141.   The campaign is led nationally in the United States by the Defendant USCPR and

the International Jewish Anti-Zionist Network ("IJAN").

142.   The USCPR's website states its intent and purpose in its campaign and conspiracy

to interfere with, and destroy, the business, assets, operations of Plaintiff KKL-JNF:

'**Stop the Jewish National Fund is an international campaign aimed at ending the
role of the Jewish National Fund (Keren Kayemet LeIsrael/JNF-KKL")**



143.   Accordingly, the Defendant engages in a planned campaign and conspiracy to damage the Plaintiffs knowing that:

a.      the GRM is not a peaceful protest, and as clearly demonstrated herein, is an organized, violent gathering sponsored and supported by HAMAS, and other terrorist organizations, intended to sabotage Israel's border fence, plant explosive charges, and launch incendiary terror balloons and kites toward Israeli communities to burn the forests, parks, and farmlands on the Israeli side of the border and to terrorize the people and citizens of Israel and to the damage of Plaintiff KKL-JNF and the Individual Plaintiffs.

b.      the incendiary terror balloons and kites are launched during and from GRM, and therefore, by promoting and supporting the GRM, directly or indirectly through its material sponsorship of the BNC and/or others, the Defendant materially supports and sponsors these acts of trespass, public nuisance and terror upon the people and property of Israel, including the Plaintiffs; and

41

c.      that its promotion and support of the Stop The JNF Campaign has (and will continue to have) materially damaged and interfered with the business, assets and operations of Plaintiff KKL-JNF.

### Keren Kayemeth LeIsrael-Jewish National Fund

144.     KKL-JNF was founded as a national fund of and on behalf of the Jewish people on December 29, 1901, at the Fifth Zionist Congress in Basle, Switzerland and was registered as a company in 1907. KKL-JNF was originally created to help purchase land in modern day Israel and begin rebuilding Jewish communities on the newly purchased land located in the ancient homeland of the Jewish people, and known as Israel.

145.     KKL-JNF began a project that continues through today:  the afforestation of Israel. While continuing to purchase land, KKL-JNF worked to reclaim land on barren hills, to drain swampy areas, and turn large tracts of land into lush soil for farms and forests.

146.     Between 1937 and 1947, KKL-JNF actively purchased large plots of land in the North, South, East, and West of what is now the State of Israel. While building towns and forests near the Sea of Galilee, Haifa, and Tel Aviv, southern communities such as Tekuma and Be'eri, and the forests around them, were built on KKL-JNF land through the use of KKL-JNF funding.

147.     While early forestry and settlement mostly focused on the center of the country, KKL-JNF soon began purchasing and restoring lands which eventually were used to mark Israel's borders as the new nation-in-waiting approached the time period of the UN approved Partition Plan adopted in November, 1947 in preparation for the end of the British Mandatory period, which concluded in May 1948.

148.     In 1948, at the time of the UN approved and US recognized Declaration of the Independence and creation of the sovereign State of Israel, KKL-JNF's assets reached over a

million dunams (about 386 square miles). To keep up with immigration rates, KKL-JNF purchased an additional one million dunams from the State of Israel for settlement and afforestation which led to the establishment of 102 new agricultural communities on KKL-JNF land in 1949.

149.    By the end of the 1950s, KKL-JNF had planted over fifty-seven million new trees in Israel and at least 250 communities benefited from KKL-JNF land and road improvements.

150.    Throughout the 1960s and 70s, KKL focused much of their work on expanding and diversifying the contents of existing forests, northern and southern expansion, and improving roadways throughout the country. Since Israeli statehood, KKL-JNF has reclaimed one million dunams (approximately 250,000 acres) of soil and planted another one million dunams (approximately 250,000 acres) of land with new forests.

151.    During the 1980 s, KKL-JNF undertook a huge project expanding forests in the Western Negev. The efforts were concentrated in gully control, soil conservation and afforestation. Activities of water harvesting and afforestation in the Northern Negev took place as part as the effort to rehabilitate degraded land, create a green belt around Beer Sheba and combat desertification.

152.    In the 1990's, KKL-JNF continued its work and mission.  The opening of the forests to the public, a trend that had begun in the 1970s, gained added emphasis. Free of charge, KKL-JNF's forests, parks and recreation areas attracted an annual average of 12 million visits from the public at large. Moreover, KKL-JNF began to make its forests more accessible to the physically challenged and emphasized the public to participate in "green" friendly practices.

153.    By the start of the 21st century, KKL-JNF had become Israel's largest green organization.

154.    KKL-JNF's extensive activities are carried out for the benefit of the public as a

whole and for all sectors of Israel's population, whatever their religion or ethnicity. These activities include strengthening peripheral communities, sustainability, conserving the landscape and nature, improving the environment and raising the public's level of ecological awareness for the sake of future generations.

155.    Since its foundation in 1901, KKL-JNF:

- Planted more than 220 million trees.
- Maintains 40,000 hectares (100,000 acres) of natural woodland.
- Redeemed 280,000 hectares (700,000) acres of land.
- Reclaimed 100,000 hectares (250,000 acres) of land for farming in 1000 rural communities.
- Forged 7000 kilometers of roads & forest trails.
- Prepared infrastructure for thousands of new homes.
- Developed more than 600 recreation areas, many of them accessible to the disabled.
- Built of 230 water reservoirs for water conservation and recycling.
- Rehabilitates rivers and other water sources.
- Restores archeological and historical sites.
- Educates hundreds of thousands of young people in Israel and worldwide.
- Supports and implemented research and development projects with global implications.
- Strengthens the bond between the Jewish people and Israel and its environment.
- Improves the environment throughout the country and manages its forests in adaption to climate change.
- Combats desertification - pushing back the boundaries of the desert.

156.    Today, KKL-JNF owns approximately 2.5 million dunam of land or 625,000 acres of land.  In addition, KKL-JNF owns trees in the forests which have been planted in the State of Israel, and maintains and provides as public amenities scenic trails, recreation areas, bicycle trails and public access facilities used by millions of people.

157.    Since 2018, the property and land owned by KKL-JNF have been subject to the terror incendiary balloons and kites launched from HAMAS controlled Gaza by HAMAS and/or others resulting in damage to the, *inter alia*, business operations and activities of the KKL-JNF, and its lands, trees, forests, ecological and environmental infrastructure, as well as its scenic trails, recreation areas and public amenities.

158.    As a result of the rockets, incendiary terror balloons and kites launched from HAMAS controlled Gaza by HAMAS and/or others, KKL-JNF, along with members of the public whom they serve, has/have been denied the use and enjoyment of the KKL-JNF properties located in the Gaza Envelope, and are prevented from traversing the properties due to the dangerous conditions created by the terror launchings, all to their damage.

159.    The rockets, incendiary terror balloons and kites have further damaged KKL-JNF as they have interfered with the public's health, safety and peace and with the business operations of KKL-JNF, and with regard to its providing of public amenities and access to the trees, forests, scenic trails, bicycle trails and other aspects of KKL-JNF's maintenance of these public access properties for the use and enjoyment of millions of people, which said properties are accessible to Israelis and others living in or visiting in the State of Israel.

160.    As a direct result of the acts of the Defendant, KKL-JNF has suffered tens of millions of dollars in damages.

### Goodman Family

161.    Asher and Batsheva Goodman live in Sderot located in the Gaza Envelope and have raised their family there, including three young children, for the last seven years.

162.    They have lived in constant fear of rockets attacks, but there is now a new threat. In addition to rockets flying overhead, the Goodmans are perpetually on the lookout for incendiary balloons and kites as weapons of terror.

163.    The incendiary terror balloons and kites are even more heinous and present a particularly more dangerous threat to the Goodmans. Small children like theirs usually perceive balloons and kites as toys meant for fun not something intended to harm them.

164.    Asher and Batsheva want their children to enjoy the freedom and innocence of being kids; unfortunately, that is being taken away by HAMAS' reign of rocket, balloon, and kite terror.

165.    Having to explain this situation to their children, along with the numerous experiences of seeing the rockets, incendiary balloons and kites flying overheard, has caused Asher, Batsheva, and their family great emotional distress.

166.    Batsheva and one of her sons have received psychological counseling due to their emotional distress.

167.    As a direct result of the acts of the Defendant, the Goodman Family have suffered damages.

### **Rosenfeld Family**

168.    Ephriam and Kineret Rosenfeld moved to Sderot in 1997 where they have raised their seven children.

169.    When the Rosenfelds first moved, Sderot was a small, quiet, developing town near the Gaza border. This tranquility lasted until around 2001, when during the Second Intifada HAMAS began firing rockets at the town.

170.    The Rosenfelds have been living under a constant siege of rockets ever since 2001; in recent years their safety has been threatened by HAMAS terror devices launched from Gaza. The past two years have forced the Rosenfelds to not only live with rocket barrages, but now Ephriam, Kineret, and their children have been made to fear children's toys – terror kites and balloons.

171.    In addition to constant fear of rockets, the Rosenfelds are now under constant threat of attacks from incendiary terror balloons and kites.

172.    Ephriam and Kineret have had to explain to their young children that what was once exciting, kites and balloons, is now a grave threat. The Rosenfelds have had to teach their children that balloons and kites are dangerous; it is nearly impossible for the children to enjoy kites and balloons in any context, even when they know the origin of the kite or balloon, there is still a deep fear.

173.    On Saturday, July 14, 2018, nearly twenty years after moving to Sderot, the Rosenfeld's home was hit by a HAMAS rocket. Fortunately, no one was inside at the time or physically injured. However, the damage to their home was significant and the resulting emotional distress of the entire family is even worse.

174.    At the time of the attack, Ephriam was at synagogue. He was informed by another congregant that his house had been hit by a rocket.

175.    On Ephriam's frantic walk back home, he was frantically looking for shelters for cover in case there were more rockets fired.

176.    Ephriam will never forget the scene he encountered when he got home.

177.    The windows were blown out of their building, requiring replacement, along with other devastating damage; and their backyard had to be repaired. The building floor was full of blood and water as broken pipes carried the blood of Ephriam's neighbors into public areas. The entire building smelled like something had been severely burned.

178.    Kineret was already home by the time Ephriam returned. She had been drinking coffee and enjoying some light reading in their parking lot when the warning sirens rang and the rocket hit their home.

179.    Kineret bravely found her neighbor and comforted her. Afterwards, Kineret herself needed help as she was compulsively shaking.

180.    Ephriam and Kineret made the decision to send their young children living at home, to Kineret's parent's home while the two of them suffered through the initial chaos that ensued after the rocket attack.  The windows have been repaired, the building repainted, and the blood cleaned, but Ephriam and Kineret can do nothing about the terror under which their children are forced to live.

181.    A.R., their twelve year-old son, underwent extensive therapy for six months following the rocket attack due to emotional distress and constant fear he feels, no longer in counseling.

182.    Their youngest son, B.R. who is nine years old, started counseling in August 2019, after having to wait for an extensive time because of the long waiting list to receive counseling from the counseling center located in Sderot. He has a hard time sleeping, he frequently has bad dreams, and on weekends, he refuses to leave the house even to go outside and play with friends.

183.    As a direct result of the acts of the Defendant, the Rosenfeld Family have suffered damages.

## Vaknin Family

184.    Bracha and Yosef Vaknin live in Netivot, located in the Gaza Envelope and have raised their family there, including five young children, for the last ten years.

185.    Their home is less than 13km from forests which have been burned as a result of the incendiary terror balloons and kites which have been landed in this area.

186.    They have lived in constant fear of rockets attacks, but there is now a new threat. In addition to rockets flying overhead, the Vaknin's are perpetually on the lookout for incendiary balloons and kites as weapons of terror.

187.    The incendiary terror balloons and kites are even more heinous and present a

particularly more dangerous threat to the Vaknin's Small children like theirs usually perceive balloons and kites as toys meant for fun not something intended to harm them.

188.    In addition, the Vaknin family is no longer able to enjoy the pleasure of family outings in public lands and gardens. Prior to the terror attacks, the Vaknin's would go to the Shokeda Forest, a forest started by KKL-JNF in the 1950's. The Shokeda Forest includes heritage sites, plays areas, picnic sites and cycling trails and the Vaknin family would go there to picnic and take pictures as a family.  As a result of the terror balloons and kites, fires have caused damage to the Shokeda Forest and the Vaknin family is no longer able to enjoy it as they once did.

189.    In addition, their ability to travel freely between their home and neighboring towns such as Sderot and Ashkelon has been limited.  Frequently in the fall of 2018, highway 34, the main thoroughfare connecting these towns is shut down because of fires and smoke which obstruct the highway.  This is particularly problematic for Yosef, as his employment requires him to travel to Ashkelon.

190.    Bracha and Yosef want their children to enjoy the freedom and innocence of being kids; unfortunately, that is being taken away by HAMAS' reign of rocket, balloon, and kite terror.

191.    Having to explain this situation to their children, along with the numerous experiences of seeing the rockets, incendiary balloons and kites flying overheard, has caused Bracha and Yorsef, and their family great emotional distress.

192.    Rocket fire and constant fear of fires the Vaknin children have experienced extreme psychological symptoms of anxiety including bed-wetting, nightmare, hyperactivity and anger.

193.    Bracha and Yosef have sought mental health counseling for two of their sons. While they have received some treatment, the fear anxiety continues to affect them today including in their education and speech development.

194.    Since the launchings of the incendiary terror balloons and kites the Vaknin children have all regressed mentally and emotionally.

195.    Seeing the balloons, kites and fires has caused each of them extreme mental anguish.

196.    As a direct result of the acts of the Defendant, the Vaknin Family has suffered damages.

### CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

**AIDING AND ABETTING FOREIGN TERRORIST
ORGANIZATIONS IN VIOLATION OF 18 U.S.C. § 2333(d)
(On behalf of the Goodman, Rosenfeld and Vaknin Plaintiffs)**

197.    The Goodman, Rosenfeld and Vaknin Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

198.    The Goodman Plaintiffs, Rosenfeld Plaintiffs and Vaknin Plaintiffs assert this cause of action under 18 U.S.C. § 2333(d) and the Justice Against Sponsors of Terrorism Act ("JASTA") § 2b.

199.    The Goodman, Rosenfeld, Vaknin Plaintiffs are nationals of the United States.

200.    HAMAS is and was a Foreign Terror Organization at the time they committed, planned, and authorized the terrorist attacks that injured the Goodman, Rosenfeld and Vaknin Plaintiffs.

201.    Those terrorist attacks were acts of international terrorism, as defined by 18 U.S.C. § 2331.  The attacks: (a) involved violence and endangered human life; (b) would have violated federal and state criminal law, had they been committed in the United States; (c) appeared to be intended to intimidate or coerce the civilian populations of Israel and the United States, to influence the policies of the Israeli and American governments, and to affect the policies of those

50

governments through violent action; and (d) occurred primarily outside the United States and transcended national boundaries in that HAMAS has raised money internationally, intended to impact the citizens and governments of Israel and the United States, and operated internationally and sought asylum in multiple countries in the Middle East.

202. USCPR knowingly provided material support, substantial assistance, and served as the fiscal sponsor for the BNC, which included HAMAS, a Foreign Terror Organization, thereby providing substantial assistance to those acts of international terrorism.

203. As the Goodman, Rosenfeld and Vaknin Plaintiffs allege in detail above, USCPR provided substantial assistance to HAMAS, among other conduct: (a) transferring presently unknown sums of money to the FTO, their operatives and their front organizations; (b) providing HAMAS with access to U.S. dollars; (c) providing legitimacy to HAMAS' efforts to raise funds to finance their operations and to compensate terrorists and their family members following terrorist attacks; and (d) enabling HAMAS to convert funds nominally intended to support humanitarian causes into the resources necessary to commit terrorist attacks.

204. USCPR's substantial assistance provided encouragement to, and aided and abetted, the acts of terrorism described herein.

205. At the time USCPR provided substantial assistance to HAMAS, through its sponsorship of the BNC and otherwise, USCPR knew that: (a) HAMAS was a designated FTO; (b) HAMAS and its operatives engage in terrorism, including the attacks alleged herein; and (c) the financial assistance that the USCPR was providing to HAMAS was essential to its ability to carry out terrorist attacks, including the attacks that injured the Goodman, Rosenfeld and Vaknin Plaintiffs.

206. This substantial assistance included, but was not limited, to support HAMAS and

the terrorist attacks it perpetrates, supports and/or encourages through the GRM and other means.

207.    USCPR intended that its substantial assistance would facilitate the ability of HAMAS and other foreign terror organizations to carry out its terrorist attacks against the Goodman, Rosenfeld and Vaknin Plaintiffs and other civilians.  As a result, USCPR played an integral role in the FTOs' terrorist activities.

208.    The substantial assistance that USCPR provided to HAMAS was a substantial factor in causing Goodman, Rosenfeld and Vaknin Plaintiffs' injuries.  Moreover, Goodman, Rosenfeld and Vaknin Plaintiffs' injuries were a foreseeable result of that substantial assistance.

209.    As a direct and proximate result of the substantial, knowing assistance that USCPR provided to HAMAS, Goodman, Rosenfeld and Vaknin Plaintiffs have suffered significant physical, psychological and emotional injuries.

210.    USCPR is therefore liable to the Goodman, Rosenfeld and Vaknin Plaintiffs for damages in an amount to be determined at trial, treble damages, and the payment of the attorneys' fees and expenses incurred by Goodman, Rosenfeld and Vaknin Plaintiffs in connection with this action.

## SECOND CLAIM FOR RELIEF

### PROVIDING MATERIAL SUPPORT TO TERRORISTS
### IN VIOLATION OF 18 U.S.C. § 2339A AND 18 U.S.C. § 2333(a)
**(On behalf of the Goodman, Rosenfeld, Vaknin Plaintiffs)**

211.    The Goodman, Rosenfeld, Vaknin Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

212.    The Goodman, Rosenfeld, Vaknin Plaintiffs assert this claim for USCPR's violation of 18 U.S.C. §§ 2333(a) and 2339A.

213.    The Goodman, Rosenfeld, Vaknin Plaintiffs are nationals of the United States.

214.    As the Goodman, Rosenfeld, Vaknin Plaintiffs allege in detail above, the financial assistance and material support that USCPR provided to HAMAS played an integral role in the ability of this FTO and the terrorist operatives to carry out terrorist attacks, including the attacks that injured the Goodman, Rosenfeld, Vaknin Plaintiffs.

215.    That financial assistance provided material support to the efforts of HAMAS to engage in acts of international terrorism, including the attacks that injured Plaintiffs.

216.    As a result, USCPR committed acts of international terrorism, as defined by 18 U.S.C. § 2331.

217.    Specifically, the substantial financial assistance and material support that USCPR provided to HAMAS and the terrorists who committed the attacks which injured the Individual Plaintiffs constituted acts of international terrorism because that financial assistance: (a) directly endangered human life; (b) violated federal and state laws regarding, among other crimes, money laundering and terror financing; (c) appeared to be intended to intimidate or coerce the civilian populations of Israel and the United States, to influence the policies of the Israeli and American governments, and to affect the policies of those governments; and (d) transcended national boundaries in that USCPR  operated internationally and provided its financial assistance to HAMAS.

218.    USCPR provided its material support to HAMAS, through the BNC and otherwise, knowing or intending that HAMAS would utilize the financial assistance that USCPR provided in furtherance of their terrorist activities, including the attacks that injured the Goodman, Rosenfeld, and Vaknin Plaintiffs.

219.    HAMAS did rely upon the financial assistance and material support provided by USCPR in carrying out the FTO's terrorist activities.

220.     HAMAS engages in acts of physical violence outside of the United States with the intent to kill or to cause serious injuries to the Goodman, Rosenfeld, and Vaknin Plaintiffs, nationals of the United States.  HAMAS engages in that illicit conduct pursuant to a joint plan and conspiracy with USCPR.

221.     The HAMAS and the terrorists who carried out the acts of terrorist violence did cause the Goodman, Rosenfeld and Vaknin Plaintiffs serious injuries.

222.     The material support and substantial assistance that USCPR provided to HAMAS was a substantial factor in causing the Goodman, Rosenfeld, and Vaknin Plaintiffs' injuries. Moreover, the Goodman, Rosenfeld and Vaknin Plaintiffs' injuries were a foreseeable result of the material support and substantial assistance that USCPR provided to HAMAS.

223.     As a direct and proximate result of the material support and substantial assistance that USCPR knowingly provided to HAMAS, the Goodman, Rosenfeld, and Vaknin Plaintiffs have suffered significant psychological and emotional injuries.

224.     USCPR is therefore liable to the Goodman, Rosenfeld and Vaknin Plaintiffs for damages in an amount to be determined at trial, treble damages, and the payment of the attorneys' fees and expenses incurred by the Goodman, Rosenfeld and Vaknin Plaintiffs in connection with this action.

**THIRD CLAIM FOR RELIEF**

**PROVIDING MATERIAL SUPPORT TO**
**FOREIGN TERRORIST ORGANIZATIONS IN**
**VIOLATION OF 18 U.S.C. § 2339B(a)(1) AND 18 U.S.C. § 2333(a)**
**(On behalf of the Goodman, Rosenfeld and Vaknin Plaintiffs)**

225.     The Goodman, Rosenfeld Vaknin Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

226.     The Goodman, Rosenfeld and Vaknin Plaintiffs assert this claim for USCPR's

violation of 18 U.S.C. §§ 2333(a) and 2339B(a)(1).

227.    The Goodman, Rosenfeld and Vankin Plaintiffs are nationals of the United States.

228.    At the time of the attacks that injured the Goodman, Rosenfeld and Vaknin Plaintiffs, HAMAS was a designated FTO.

229.    At that time, USCPR knew that HAMAS was an FTO, and that HAMAS engaged in terrorist activity and terrorism.

230.    As the Goodman, Rosenfeld and Vaknin Plaintiffs allege in detail above, USCPR provided material support to HAMAS.

231.    That material support was integral to the ability of HAMAS to carry out its terrorist attacks, including the attacks that injured the Goodman, Rosenfeld and Vaknin Plaintiffs.

232.    As the Goodman, Rosenfeld and Vaknin Plaintiffs allege in detail above, the material support that USCPR provided to HAMAS constituted acts of international terrorism, as defined in 28 U.S.C. § 2331(1).

233.    The material support that USCPR provided to HAMAS, through the BNC and otherwise,  was a substantial and foreseeable factor in causing the Goodman, Rosenfeld and Vaknin Plaintiffs' injuries.

234.    Moreover, the Goodman, Rosenfeld and Vaknin Plaintiffs' injuries were a foreseeable result of the material support and substantial assistance that USCPR provided to HAMAS.

235.    As a direct and proximate result of the material support and substantial assistance that USCPR knowingly provided to HAMAS, the Goodman, Rosenfeld and Vaknin Plaintiffs have suffered significant psychological and emotional injuries.

236.    USCPR is therefore liable to the Goodman, Rosenfeld and Vaknin Plaintiffs for

damages in an amount to be determined at trial, treble damages, and the payment of the attorneys' fees and expenses incurred by the Goodman, Rosenfeld and Vaknin Plaintiffs in connection with this action.

## FOURTH CLAIM FOR RELIEF

### CONSPIRACY TO COMMIT TRESPASS AND DESTRUCTION OF PROPERTY COMMON LAW
**(On behalf of KKL-JNF, Rosenfeld and Vaknin Plaintiffs)**

237.    Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

238.    Plaintiffs assert this claim for USCPR's conspiracy to commit trespass.

239.    At the time of the terrorist attacks, HAMAS engaged in a series of intentional attacks with the intention of intruding upon property of the Plaintiff KKL-JNF, the Rosenfeld and Vaknin Plaintiffs to invade and disrupt the Plaintiffs owners of the property, with the exclusive possession of that property.

240.    These attacks include the launching of rockets, and incendiary terror balloons and kites that are designed to set fire and cause destruction to the property of the Plaintiffs.

241.    The arson fires that are the result of this terrorist activity have cause significant extensive damage to the trees, forests, scenic trails, bicycle trails, public amenities, environmental and ecological infrastructure and resultant damage to the ecosystems of the trees, forests and lands, all to the damage of Plaintiff KKL-JNF.  They have also posed significant health and safety dangers to the Plaintiffs and members of the public at large, because of the inhalation of smoke and other resultant damages directly caused by the acts of international terror described hereinabove

242.    In addition, significant monetary resources have been expended fighting and

56

extinguishing fires caused by the missiles, rockets, incendiary terror balloons and kites, thereby impinging on the availability of emergency services for the Plaintiffs and public and large.

243.    USCPR knew that in working with and providing financial support to HAMAS through BNC, and by otherwise agreeing to support, promote and sponsor the GRM, it was funding and supporting an FTO to commit acts of international terrorism and trespass and illegally enter and destroy the property of KKL-JNF, the Rosenfelds and the Vaknins.

244.    This support included, but was not limited to, monetary transfers directly from the Campaign to the BNC, sponsoring the BNC representative in North America, being the "BNC's most important strategic ally and partner in the U.S.", promoting and sponsoring the GRM, and leading in the United States the "Stop the Jewish National Fund" campaign, all to the damage and detriment of KKL-JNF and the Rosenfeld and Vaknin Plaintiffs.

245.    USCPR knew or should have known and was generally aware of the terrorist activities which were committed by HAMAS.

246.    By knowingly soliciting and transferring funds to alleged HAMAS-controlled "entities" and by otherwise directly and indirectly promoting and sponsoring the GRM, USCPR conspired to commit acts of terrorist trespass on Plaintiffs' property.

247.    HAMAS, with the support of its co-conspirator USCPR, unlawfully and without authorization entered Plaintiffs' Property with the intent to interfere in the Plaintiffs' possessory interest in their Property.

248.    These terror attacks caused damage to Plaintiffs' property.

249.    As a direct and proximate result of the material support and substantial assistance that USCPR knowingly provided to HAMAS, KKL-JNF, and the Rosenfeld and Vaknin Plaintiffs have suffered significant damages all their detriment.

250.   USCPR is therefore liable to KKL-JNF and the Rosenfeld and Vaknin Plaintiffs, and each of them, for damages in an amount to be determined at trial by a jury.

## FIFTH CLAIM FOR RELIEF

### CONSPIRACY TO COMMIT PUBLIC NUISANCE
### COMMON LAW
(**All Plaintiffs**)

251.   Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

252.   Plaintiffs assert this claim for USCPR's conspiracy to commit a public nuisance.

253.   At the time of the terrorist attacks, HAMAS engaged in a series of intentional attacks with the intention of continuously intruding upon property of the Plaintiffs to invade and disrupt the Plaintiffs, who had the exclusive possession of that property and the public who had a public right to use and enjoy the property.

254.   The arson fires that are the result of this terrorist activity have cause significant large damage including loss of infrastructure and ecosystems.  They have also posed significant health and safety dangers to the Plaintiffs and members of the public at large, because of the inhalation of smoke.

255.   In addition, significant monetary resources, equipment and personnel have been expended fighting and extinguishing fires caused by the rockets, and incendiary terror kites and balloons, thereby impinging on the availability of emergency services for the Plaintiffs and the public at large.

256.   USCPR knew that in providing financial support to HAMAS, through BNC and others, and by otherwise supporting, promoting and sponsoring the GRM, it was funding and supporting, aiding and abetting, and providing material support to an FTO.

257.     This support included, but was not limited to, monetary transfers directly from the Campaign to the BNC, made up of Foreign Terror Organizations, in violation of applicable US law,  sponsoring the BNC representative in North America, being the "BNC's most important strategic ally and partner in the U.S.", promoting and sponsoring the GRM, and leading in the United States the "Stop the Jewish National Fund" campaign, all to the damage and detriment of the Plaintiff, KKL-JNF and the Individual Plaintiffs.

258.     USCPR knew or should have known and was generally aware of the terrorist activities which were committed by HAMAS.

259.     By knowingly soliciting and transferring funds to alleged HAMAS-controlled "entities" and by otherwise directly and indirectly promoting and sponsoring the GRM,  USCPR conspired to commit acts of public nuisance which interfered with Plaintiffs' and the public at large's right to enjoy and use the property and caused damage to human health and safety.

260.     These repeated instances of setting fires and explosions on Plaintiffs' property has caused an unreasonable interference with the Plaintiffs' and the public-at-large's, right to enjoy and use the property.

261.     The right to use the property which is owned and maintained by Plaintiffs has caused not only damage to the property itself, but also interfered with members of the public safety, peace and has caused serious risk of injury or death as result of the falling incendiary balloons, kite bombs and resultant fires, all of which has caused damage to the Plaintiffs, and each of them.

262.     As a direct and proximate result of the material support and substantial assistance that USCPR knowingly provided to HAMAS, the Plaintiffs have suffered significant damages all to Plaintiffs' detriment.

263.     USCPR is therefore liable to the Plaintiffs for damages in an amount to be

determined at trial by jury.

## SIXTH CLAIM FOR RELIEF

## CONSPIRACY TO TORTIOUSLY INTERFERE IN BUSINESS RELATIONSHIPS AND BUSINESS OPERATIONS COMMON LAW
### (On behalf of KKL-JNF)

264.    Plaintiff repeats and re-alleges each and every allegation of the foregoing paragraphs as if fully set forth herein.

265.    Plaintiff KKL-JNF asserts this claim for USCPR's conspiracy to tortuously interfere in KKL-JNF's business relationships by promoting and participating in the STOP THE JNF Campaign.

266.    As described above, since 2009 and continuing until today, Defendant USCPR, the BNC, IJAN and/or others have worked to promote and participate in an international campaign directly targeting Plaintiff KKL-JNF under the "Stop the JNF Campaign" to interfere and destroy the business assets, operations and expected assets of Plaintiff KKL-JNF.

267.    This campaign included, but was not limited, to promoting and participating in  a coordination of campaigns against KKL-JNF to, *inter alia,* inhibit their fundraising apparatus' and disrupt the business operations of KKL-JNF in Israel, including, but not limited to, its support and maintenance of land, trees, forests, ecological and environmental structures, educational activities as well as its scenic trails, recreation areas and public amenities.

268.    At the time USCPR engaged in this conspiratorial activity, USCPR knew that KKL-JNF had business relationships that relies on fundraising, reforestation of Israel, preservation of and maintenance of land, tress, forests, ecological and environmental structures, as well its scenic trials, recreation areas and public amenities and that by promoting and participating in STOP THE

JNF Campaign, KKL-JNF would be damaged in their business assets or expected business assets.

269.    USCPR knew that by agreeing and working in concert with the BNC, IJAN and others in promoting and participating in the STOP THE JNF Campaign, it would maliciously injure and damage the business operations of Plaintiff, KKL-JNF and hinder it from supporting its mission to support and maintain the land, trees, forests, ecological and environmental structures in Israel, as well as its scenic trails, recreation areas and public amenities.

270.    This has caused an unreasonable interference with the KKL-JNF's business operations and entitlement to conduct its businesses without the intentional interference in business relations to which Plaintiff KKL-JNF has the right to enjoy.

271.    As a result of the STOP THE JNF Campaign, and the actions of Defendant USCPR as an active conspirator in said campaign, Plaintiff KKL-JNF has been damaged in its business relationships, reputation and business operations. USCPR is therefore liable to Plaintiff KKL-JNF for damages in an amount to be determined at trial.

## JURY TRIAL DEMAND

The Plaintiffs, and each of them, demand a jury trial and request a jury be empaneled to hear the within causes of action.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request this Court find the Defendant liable and enter Judgment against the Defendant as follows:

a.    Awarding to the Goodman, Rosenfeld and Vaknin Plaintiffs compensatory damages for the pain and suffering, extreme mental and emotional anguish, and economic loss, against Defendant in amounts as shall be determined at trial, in accordance with evidence to be submitted to this Court at a trial by jury;

b.      Awarding to the Goodman, Rosenfeld and Vaknin Plaintiffs treble damages pursuant to 18 U.S.C. § 2333(a);

c.      Awarding to the Goodman, Rosenfeld and Vaknin Plaintiffs for any and all costs sustained in connection with the prosecution of this action, including attorneys' fees, pursuant to 18 U.S.C. § 2333(a);

d.      Awarding to the Trespass Plaintiffs compensatory damages for the loss and interference in the Plaintiffs' possessory interest in their Property in amounts as shall be determined at trial, in accordance with evidence to be submitted to this Court at a trial by jury;

e.      Awarding to the Public Nuisance Plaintiffs compensatory damages for the loss of the right to use and enjoy their property in amounts as shall be determined at trial, in accordance with evidence to be submitted to this Court at a trial by jury;

f.      Awarding to KKL-JNF compensatory damages for the tortious interference in their business relationships and operations, in amounts as shall be determined at trial, in accordance with evidence to be submitted to this Court at a trial by jury;

g.       Leave to amend this Complaint as the interests of justice may allow;

h.      Trial by jury on all issues so triable; and

i.      Granting any and all such further relief as the Court may deem just and proper.

Dated: November 13, 2019              Respectfully submitted,

Heideman Nudelman & Kalik, P.C.
1146 19th Street, NW, Fifth Floor
Washington, DC 20036
(202) 463-1818

By: */s/Richard D. Heideman*_____
      Richard D. Heideman (DC Bar No. 377462)
      Noel J. Nudelman (DC Bar No. 449969)
      Tracy Reichman Kalik (DC Bar No. 462055)