# EXHIBIT A

2021 WL 2345642
Only the Westlaw citation is currently available.
United States Court of Appeals, Second Circuit.

Chaim KAPLAN, Rivka Kaplan, Brian Erdstein, Karene Erdstein, Ma'Ayan Erdstein, Chayim Kumer, Nechama Kumer, Laurie Rappepport, Margalit Rappeport, Theodore (Ted) Greenberg, Moreen Greenberg, Jared Sauter, Dvora Chana Kaszemacher, Chaya Kaszemacher Alkareif, Avishai Reuvane, Elisheva Aron, Yair Mor, and Mikimi Steinberg, Plaintiffs-Appellants,
v.
LEBANESE CANADIAN BANK,

SAL, Defendant-Appellee.*

Docket No. 19-3522
|
August Term, 2020
|
Argued: November 19, 2020
|
Decided: June 9, 2021

Appeal from the United States District Court for the Southern District of New York, George B. Daniels, *Judge*.

**Attorneys and Law Firms**

GARY M. OSEN, Hackensack, New Jersey (Ari Ungar, Michael Radine, Dina Gielchinsky, Aaron A. Schlanger, Osen, Hackensack, New Jersey; Robert J. Tolchin, The Berkman Law Office, Brooklyn, New York, on the brief), for Plaintiffs-Appellants.

JONATHAN D. SIEGFRIED, New York, New York (Douglas Walter Mateyaschuk, DLA Piper (US), New York, New York, on the brief), for Defendant-Appellee.

HOGAN LOVELLS US, New York, New York (Marc J. Gottridge, Lisa J. Fried, Benjamin A. Fleming, New York, New York, of counsel), filed a brief for Amici Curiae The Institute of International Bankers and The European Banking Federation, in support of Defendant-Appellee.

STEPHEN I. VLADECK, Austin, Texas, filed a brief for Amici Curiae Law Professors, in support of Plaintiffs-Appellants.

Before: LIVINGSTON, Chief Judge, KEARSE and WESLEY, Circuit Judges.

**Opinion**

KEARSE, Circuit Judge:

*1 Plaintiffs Chaim Kaplan *et al.*, United States citizens who were victims of rocket attacks in Israel in July and August 2006 (the "2006 Summer rocket attacks") (hereinafter "Plaintiffs"), allegedly carried out by the designated foreign terrorist organization ("FTO") Hizbollah (so spelled in the operative complaint, and hence also in this opinion, except when quoting documents that use an alternative spelling), appeal from a November 4, 2019 judgment of the United States District Court for the Southern District of New York, George B. Daniels, *Judge*, dismissing, for failure to state a claim on which relief can be granted, their second amended complaint seeking (A) to hold defendant Lebanese Canadian Bank, SAL ("LCB" or the "Bank"), liable as a principal under the Antiterrorism Act of 1990 ("ATA"), *see* 18 U.S.C. §§ 2331(1), 2333(a), for providing banking services to certain individuals or entities alleged to be part of or closely affiliated with Hizbollah; and (B) to hold LCB liable under the Justice Against Sponsors of Terrorism Act ("JASTA"), *see* 18 U.S.C. § 2333(d)(2), as a coconspirator or an aider and abettor in Hizbollah's terrorist attacks. The district court granted the Bank's motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), concluding that the second amended complaint (A) failed to state a claim under the ATA, principally because it lacked plausible factual allegations that LCB itself had engaged in acts of terrorism, and (B) failed to state a claim under JASTA because it lacked nonconclusory factual allegations (1) that the Bank had entered into a conspiracy or agreement with Hizbollah to commit acts of terrorism, or (2) that the Bank had knowingly provided assistance to Hizbollah affiliates and was aware that, in providing those services, it was playing a role in Hizbollah's acts of terrorism. *See Kaplan v. Lebanese Canadian Bank, SAL*, 405 F.Supp.3d 525 (S.D.N.Y. 2019) ("*Kaplan v. LCB*"). On appeal, Plaintiffs seek reversal only of the dismissal of their JASTA aiding-and-abetting claims, contending principally that the district court did not correctly apply the analytical framework set out in *Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983), specified by Congress as the proper legal framework for assessing such claims, that the court erred in its assessment of the plausibility of their allegations that the Bank had knowledge of its customers' affiliation with Hizbollah, and that it failed to draw the permissible inferences that LCB

provided Hizbollah's affiliates with substantial assistance and was generally aware that it was thereby playing a role in Hizbollah's terrorism.

Plaintiffs having abandoned their ATA claims and JASTA conspiracy claims, we address only their JASTA aiding-and-abetting claims; and as to the latter, we find merit in Plaintiffs' contentions. Accordingly, we vacate so much of the judgment as dismissed Plaintiffs' JASTA claims of aiding and abetting, and remand for further proceedings on those claims.

## I. BACKGROUND

**\*2** This case was initiated in July 2008 by several dozen American, Canadian, or Israeli citizens who were injured, or represented persons who were injured or killed, in the 2006 Summer rocket attacks. Their amended complaint filed in 2009 asserted, *inter alia*, claims against LCB principally under the ATA and the Alien Tort Statute, 28 U.S.C. § 1350 (or "ATS"), along with negligence claims against American Express Bank Ltd. ("American Express"). The ATS gives federal district courts jurisdiction to entertain a civil tort action "by an alien." 28 U.S.C. § 1350. The ATA grants United States nationals a private right of action for injury caused by an act of international terrorism. *See* 18 U.S.C. § 2333(a); *see also id*. § 2331(1) (defining "international terrorism" to include activities that would violate the criminal laws of the United States or any State and that, *inter alia*, "involve violence or endanger human life" and "appear to be intended" to intimidate or coerce a civilian population or government). The amended complaint alleged that the defendants had intentionally and/or negligently provided Hizbollah with wire transfer services involving millions of dollars, enabling and assisting Hizbollah to carry out terrorist attacks, including those that injured the plaintiffs or their decedents. (*See* Part I.C. below.)

### A. *The Course of This Litigation*
The case is now before this Court for the fourth time, but substantially narrowed both as to plaintiffs and as to claims. The prior stages of the case have been the subject of many opinions--most of them styled with a lead plaintiff called "*Licci*" or "*Licci ex rel. Licci*" or "*Licci by Licci*" (hereinafter collectively "*Licci*")--familiarity with which is assumed. *See, e.g.*, Licci v. American Express Bank Ltd., 704 F.Supp.2d 403, 408 (S.D.N.Y. 2010) ("*Licci I*") (dismissing the negligence claims against American Express for failure to state a claim, and dismissing the claims against LCB for lack of personal jurisdiction), *affirmed in part*, 672 F.3d 155 (2d Cir. 2012), and *vacated and remanded in part*, 732 F.3d 161 (2d Cir. 2013); Licci v. Lebanese Canadian Bank, SAL, 673 F.3d 50, 75 (2d Cir. 2012) ("*Licci II*") (certifying personal-jurisdiction questions of New York law to the New York Court of Appeals, including whether "a foreign bank's maintenance of a correspondent bank account at a financial institution in New York, and use of that account to effect 'dozens' of wire transfers on behalf of a foreign client, constitute a 'transact[ion]' of business in New York within the meaning of N.Y. C.P.L.R. § 302(a)(1)"); Licci v. Lebanese Canadian Bank, SAL, 20 N.Y.3d 327, 960 N.Y.S.2d 695, 984 N.E.2d 893 (2012) ("*Licci III*") (answering the above *Licci II*-certified question in the affirmative); Licci v. Lebanese Canadian Bank, SAL, 732 F.3d 161 (2d Cir. 2013) ("*Licci IV*") (noting the *Licci III* ruling as to New York law; holding that the exercise of personal jurisdiction over LCB in New York comported with the due process requirements imposed by the United States Constitution; and vacating so much of *Licci I* as dismissed the claims against LCB for lack of personal jurisdiction, and remanding for further proceedings); Licci v. Lebanese Canadian Bank, SAL, Civ. No. 08-cv-7253, 2015 WL 13649462 (S.D.N.Y. Apr. 14, 2015) ("*Licci V*") (dismissing plaintiffs' ATS claims for lack of subject matter jurisdiction, and dismissing their ATA claims on the ground of collateral estoppel based on Kaplan v. Central Bank of the Islamic Republic of Iran, 961 F.Supp.2d 185 (D.D.C. 2013)) ("*Kaplan versus Iranian banks I*") (dismissing ATA claims complaining of the 2006 Summer rocket attacks--brought by the same plaintiffs who brought *Licci I*--as beyond the scope of the ATA, given its exclusion of claims for injuries caused by an "act of war," 18 U.S.C. § 2336(a)), *vacated in part*, 896 F.3d 501 (D.C. Cir. 2018) ("*Kaplan versus Iranian banks II*"); and Licci v. Lebanese Canadian Bank, SAL, 834 F.3d 201 (2d Cir. 2016) (affirming the *Licci V* ATS dismissals) and 659 F. App'x 13 (2d Cir. 2016) (affirming the *Licci V* ATA dismissals), *cert. denied*, ––– U.S. ––––, 138 S. Ct. 1691, 200 L.Ed.2d 948 (2018).

### B. *Interim Legal Developments*
In the decade following the 2008 commencement of this action, the rights and claims of the original plaintiffs were impacted by at least three alterations, clarifications, or interpretations of relevant law. First, in 2016 the ATA--which did not originally provide a private right of action against actors who facilitated terrorist acts by others but did not commit such acts themselves, *see, e.g.*, Rothstein v. UBS AG,

708 F.3d 82, 97 (2d Cir. 2013) ("*Rothstein*"); *Linde v. Arab Bank, PLC*, 882 F.3d 314, 319-20 (2d Cir. 2018) ("*Linde*"); *Siegel v. HSBC North America Holdings, Inc.*, 933 F.3d 217, 222 (2d Cir. 2019) ("*Siegel*")--was amended by the enactment of JASTA. As discussed further in Part II.B.1. below, JASTA provides that a civil action for injury in an international terrorist attack from an organization that had been designated an FTO at the time of the attack's commission, planning, or authorization, may be maintained on a theory of conspiracy or a theory of aiding and abetting. *See* 18 U.S.C. § 2333(d)(2). Congress also provided that with respect to such an injury occurring on or after September 11, 2001, such a secondary liability theory would be retroactively available in any action that was pending on or commenced after the date of JASTA's enactment. *See* JASTA, Pub. L. No. 114-222, § 7, 130 Stat. at 855 (Sept. 28, 2016).

**\*3** Second, in 2018 the Supreme Court ruled that the ATS does not authorize a tort action against a foreign corporation. *See Jesner v. Arab Bank, PLC*, ––– U.S. ––––, 138 S. Ct. 1386, 1407, 200 L.Ed.2d 612 (2018); *see also Kiobel v. Royal Dutch Petroleum Co.*, 621 F.3d 111, 145 (2d Cir. 2010) (ruling that the ATS does not authorize a tort action against any corporation), *aff'd on other grounds*, 569 U.S. 108, 124, 133 S.Ct. 1659, 185 L.Ed.2d 671 (2013) (holding that the ATS does not authorize an action for a tort that occurred entirely outside of the United States).

Third, in 2018 the Court of Appeals for the District of Columbia Circuit in *Kaplan versus Iranian banks II* vacated the *Kaplan versus Iranian banks I* decision on which *Licci V* had based its dismissal of the *Licci* plaintiffs' ATA claims on the ground of collateral estoppel. The Court of Appeals ruled that "the so-called act-of-war exception" is a merits issue, not an issue of jurisdiction. *Kaplan versus Iranian banks II*, 896 F.3d at 504, 512. In addition, any such issue became moot shortly thereafter when Congress enacted the Anti-Terrorism Clarification Act of 2018, Pub. L. No. 115-253, § 2(a), 132 Stat. 3183 (Oct. 3, 2018), amending 18 U.S.C. § 2331(6)(A)(i) to clarify that acts of a designated FTO are not within the so-called act-of-war exception.

In light of the vacatur of the decision on which *Licci V* had based its collateral-estoppel dismissal of the ATA claims in this case, the district court here entertained a motion pursuant to Fed. R. Civ. P. 60(b)(5) to vacate so much of *Licci V* as dismissed plaintiffs' claims under the ATA. As the ATA grants a private right of action only to "national[s] of the United States," 18 U.S.C. § 2333(a), that motion to vacate was brought only by the plaintiffs who are American citizens. The district court granted the motion and thereafter granted those plaintiffs' request for leave to file a second amended complaint.

C. *The Second Amended Complaint*

The second amended complaint (or "SAC"), filed in December 2018 and titled *Kaplan v. Lebanese Canadian Bank, SAL*, asserted two causes of action against LCB: (1) Plaintiffs' original ATA claims charging LCB with primary liability for acts of international terrorism, *see* 18 U.S.C. § 2333(a), and (2) the newly available secondary liability claims under JASTA, *see id*. § 2333(d)(2), alleging that LCB conspired with and/or aided and abetted Hizbollah in the commission of acts of international terrorism. The SAC made factual allegations, and it recounted factual assertions made in other documents that it incorporated by reference, including a verified amended complaint filed by the United States in a civil forfeiture action against LCB in 2011, *United States v. Lebanese Canadian Bank, SAL*, Civ. No. 11-9186 (PAE) (S.D.N.Y.) ("U.S. Verified Complaint"). The SAC included the following allegations.

Plaintiffs are 18 American citizens who were injured by the 2006 Summer rocket attacks carried out by Hizbollah between July 12 and August 14, 2006. (*See* SAC ¶ 2, first ¶ numbered "4," and ¶¶ 49-60.) Hizbollah is a terrorist organization that was formed in Lebanon in approximately 1982 and is based in Lebanon. (*See* SAC second ¶ numbered "5" and ¶ 82; U.S. Verified Complaint ¶ 36.) From 1982 through July 2006 and beyond, Hizbollah carried out hundreds of terrorist attacks against Jewish civilians in Israel and elsewhere and against United States targets, killing hundreds and wounding hundreds more. (*See*, *e.g.*, SAC ¶¶ 12-15.)

> **\*4** Hizbollah's policy and practice of carrying out terrorist attacks against Jewish civilians in Israel and elsewhere and against United States targets was notorious and well known to LCB and to the public at large between 1982 and July 12, 2006, because during this period Hizbollah openly, publicly and repeatedly acknowledged having such a policy and carrying out

such attacks. Hizbollah made these acknowledgments on its official websites, in its official press releases, on its official television station, Al-Manar, on its official radio station, Al-Nour, and in numerous press conferences and news media interviews conducted by senior Hizbollah officials.

(SAC ¶ 16; *see also id*. ¶ 17 (detailing 19 such acts of terrorism by Hizbollah, including bombings, missile attacks, kidnappings, and airplane hijackings from July 1982 through August 10, 2003).)

Hizbollah has been designated by the United States as a "Specially Designated Terrorist" ("SDT") since 1995, as a "Foreign Terrorist Organization" ("FTO") since 1997, and as a "Specially Designated Global Terrorist" ("SDGT") since 2001. (SAC ¶ 19.) As a result of these designations, Hizbollah is subject to strict economic sanctions imposed by the United States; if properly observed, the sanctions would significantly hinder Hizbollah's access to banking services, including wire transfers. (*See id*. ¶¶ 25-29.) Hizbollah needs banking services in order to, *inter alia*, "build and maintain its operational infrastructure," "purchase and store weapons, explosives and other materiel," and "pay, train, transport and shelter its terrorist operatives" if it is to successfully carry out terrorist attacks. (*Id*. ¶ 26.)

Hizbollah is, *inter alia*, " 'a Shiite Islamist militia,' " with a " 'unified leadership structure that oversees the organization's complementary, partially compartmentalized elements.' " (SAC ¶ 20 (quoting Casey L. Addis and Christopher M. Blanchard, *Hezbollah: Background and Issues for Congress* (Congressional Research Service, January 3, 2011) at 1, 10).) Notwithstanding Hizbollah's division into "various subordinate entities" such as a political party and a social welfare organization, "[t]hese subordinate entities are integral, constituent parts of Hizbollah itself, and to the extent that these entities have any putative separate legal personality or corporate form, such personality or form is a sham aimed at assisting Hizbollah to conduct its criminal and terrorist activities using different names and aliases." (SAC ¶ 20.)

Hizbollah's subordinate entities include (1) Bayt al-Mal, (2) the Yousser Company for Finance and Investment (the "Yousser Company" or "Yousser"), and (3) Shahid (Martyrs) Foundation ("Shahid Martyrs" or "Shahid"). (*See id*. ¶¶ 21-23.) "Bayt al-Mal serves as a bank, creditor, and investment arm for Hizballah" and uses the Yousser Company "to secure loans and finance business deals for Hizballah companies." (*Id*. ¶ 23 (internal quotation marks omitted).) Among the individual leaders of Hizbollah are Husayn al-Shami (also known as Hussein Ali Mohamed Chami) and Wahid Mahmoud Sbeity. (*See id*. ¶ 38.) Al-Shami, the leader of Bayt al-Mal, also served as a director of the Yousser Company; Sbeity and al-Shami both held ownership stakes in Yousser; and both individuals held accounts in their names at LCB on behalf of Bayt al-Mal. (*See* U.S. Verified Complaint ¶ 47(g)(3); SAC ¶¶ 38, 81.)

Shahid Martyrs--which a senior United States military analyst has characterized as the most important branch of the Hizbollah organization--provides financial support to wounded Hizbollah terrorists and to the families of Hizbollah terrorists killed in action. (*See* SAC ¶¶ 21-22.) Quoting the same analyst, the SAC alleged that "[t]he purpose of that funding and support is to 'provide peace of mind to current *and prospective' Hizbollah terrorists*, 'by knowing that they and their families will be cared for in the event of death or injury.' " (*Id*. ¶ 22 (emphasis ours).)

**\*5**  At the times relevant to this action, LCB was a banking corporation organized under the laws of Lebanon and headquartered in Beirut, Lebanon. (*See* SAC first ¶ numbered "5".) The SAC alleged that at all relevant times, LCB had actual knowledge that terrorist organizations such as Hizbollah require wire transfer and other banking services in order to plan, prepare for, and carry out terrorist attacks, and that providing such banking services to Hizbollah would enable Hizbollah--or enhance its ability to do so. (*See* SAC ¶ 75.) LCB was also "aware of the rules promulgated by the inter-governmental Financial Action Task Force ('FATF') and by the Middle East and North Africa Financial Action Task Force ('MENAFATF') (which Lebanon has adopted), *requiring banks to know their customers*," and to "*perform due diligence and not provide banking services to terrorist organizations*." (*Id*. (emphases added).) LCB was aware that the FATF and MENAFATF rules "were intended to prevent terrorist organizations such as Hizbollah from conducting banking activities, including wire transfers, and thereby limit their ability to operate and to carry out terrorist attacks." (*Id*.) The SAC alleged that in 2002, a United Nations ("U.N.") report found that "LCB had a banking relationship" with "a Hizbollah-linked money laundering gang"; that "[i]n

response to [that U.N.] report," "LCB stated that '*we consider such allegation as part of the propaganda and war launched by the Jewish state against Lebanon*' "; and that LCB "not only refused to end the relationship, but instead authorized an *increase* in credit limits for the Hizbollah gang." (SAC ¶ 97(a) (emphases in SAC); *see* U.S. Verified Complaint ¶ 47(f).)

From at least 2003 (*see* U.S. Verified Complaint ¶ 47(g)) "and until July 12, 2006 (and later)" (SAC ¶ 37), LCB's customers included Bayt al-Mal (holding accounts in its own name and in the names of al-Shami and Sbeity), Yousser, and Shahid Martyrs (*see id*. ¶¶ 37-39, 82). The SAC asserted that at all times, those accounts "belonged to Hizbollah and were under the control of Hizbollah." (SAC ¶ 41.) And throughout that period,

> LCB had actual knowledge that Shahid, Bayt al-Mal and Yousser were integral constituent parts of Hizbollah, that the Hizbollah Accounts and the funds therein were owned and controlled by Hizbollah, and that the Hizbollah Wire Transfers were being carried out by and at the direction of Hizbollah.

(*Id*. ¶ 76.) Shahid Martyrs, Bayt al-Mal, Yousser, al-Shami, and Sbeity (the "Five Customers," *e.g.*, *Kaplan v. LCB*, 405 F.Supp.3d at 529, or herein the "Customers") maintained accounts at LCB denominated in euros, Lebanese currency, and U.S. dollars (*see*, *e.g.*, SAC ¶¶ 37-40; U.S. Verified Complaint ¶ 47(g)). Using those accounts, the Customers made and received dollar-denominated wire transfers "totaling many millions of dollars" (SAC ¶ 45) through LCB and its correspondent bank in New York, American Express (*see id*. ¶¶ 45-48).

Beginning in 2003 for certain accounts, LCB gave the Customers special treatment, exempting them from submitting cash transaction slips ("CTS") *i.e.*, documents to be filed with the Central Bank of Lebanon that disclose the sources of any cash deposit exceeding $10,000 (*see id*. ¶ 82; U.S. Verified Complaint ¶ 47(g)). For example, at one LCB branch Shahid Martyrs "was exempted from signing CTS[ ] for cash transactions up to *$100,000 per day*" (U.S. Verified Complaint ¶ 47(g)(7) (emphasis added)); and the Yousser Company, along with its owners and directors--who included al-Shami and Sbeity--were collectively granted such exemptions for cash transactions up to $80,000 per week at one LCB branch, and at another branch, up to $260,000 per day (*see id*. ¶¶ 47(g)(1)-(4)). In addition, the Customers received exemptions with respect to deposits in Lebanese currency for up to, at September 1, 2003 exchange rates, the equivalent of $33,000 per week and $132,000 per day. (*See id*. ¶¶ 47(g)(2)-(3).) Thus, the exemptions that LCB gave the Customers totaled more than $2.5 million a week.

LCB provided these services and facilitated these wire transfers notwithstanding its

> actual knowledge that Shahid, Bayt al-Mal and Yousser were integral constituent parts of Hizbollah, that the Hizbollah Accounts and the funds therein were owned and controlled by Hizbollah, and that the Hizbollah Wire Transfers were being carried out by and at the direction of Hizbollah, because the fact that Shahid, Bayt al-Mal and Yousser were integral constituent parts of Hizbollah was notorious public knowledge in Lebanon and elsewhere during the period between 2004 and until July 12, 2006.

**\*6** (SAC ¶ 77.) The SAC alleged that LCB's actual knowledge was inferable because

> [t]he fact that Shahid, Bayt al-Mal and Yousser were integral parts of Hizbollah was openly, publicly and repeatedly acknowledged and publicized by Hizbollah* during the several year period prior [to] July 12, 2006, *inter alia*[,] *on Hizbollah's official websites*, in official press releases issued by Hizbollah, *on Hizbollah's official television station*, Al-Manar, on Hizbollah's official radio station, Al-Nour, and *in numerous press conferences and news*

*media interviews conducted by senior Hizbollah officials.*

(*Id*. ¶ 78 (emphases added).)

In addition, the SAC described a dozen published English-language articles that recounted the connection between Hizbollah and Shahid Martyrs in particular (*see id*. ¶¶ 79(a)-(m)), including a December 2004 article reporting that a "public service message" by "Hizbollah's television station, Al-Manar," "tells families of suicide bombers where to go to collect the subsidy from a martyrs' foundation" (*id*. ¶ 79(i) (internal quotation marks omitted)), and a March 2005 article stating that "Shahid supplies charitable funds for Hizballah-affiliated suicide bombers" (*id*. ¶ 79(k) (internal quotation marks omitted)).

LCB moved to dismiss the second amended complaint pursuant to Rule 12(b)(6) on the ground that it failed to state a claim on which relief can be granted.

D. *The Decision of the District Court*
In a Memorandum Decision and Order dated September 20, 2019 ("Decision"), the district court granted LCB's motion to dismiss. *See Kaplan v. LCB*, 405 F.Supp.3d 525. It found that Plaintiffs failed to state a primary liability claim under the ATA because they "fail[ed] to sufficiently allege that Defendant committed any act of 'international terrorism' or that their injuries were proximately caused by Defendant's actions." *Id*. at 531. It found that the SAC also failed to state a claim for conspiracy to commit international terrorism. Noting the presence of allegations that LCB and Hizbollah had a " 'scheme' " or " 'common plan,' " the court concluded that the SAC nonetheless "fail[ed] to sufficiently allege any unlawful agreement between Defendant and Hizbollah" or to provide any "factual basis for these allegations that would lead one to infer that Defendant shared any common goal of committing an act of international terrorism." *Id*. at 534 (quoting SAC ¶ 115). The court stated that "the allegations in the complaint indicate, at most, that Plaintiffs provided financial services to the Five Customers." *Kaplan v. LCB*, 405 F.Supp.3d at 534.

As to the assertion that LCB aided and abetted Hizbollah's acts of terrorism, the court referred to the aiding-and-abetting framework established in *Halberstam v. Welch*, 705 F.2d 472 ("*Halberstam*"), which Congress had instructed should govern analysis of JASTA claims. The district court noted that

> civil aiding and abetting includes three elements: (1) "the party whom the defendant aids must perform a wrongful act that causes an injury," (2) "the defendant must be *generally aware* of his role as part of an overall illegal or tortious activity at the time that he provides the assistance," and (3) "the defendant must knowingly and *substantially assist* the principal violation." [*Halberstam*,] 705 F.2d at 477 (citations omitted). *Here, Plaintiffs fail to allege adequately the "general awareness" element **or** the "assistance" element*.

**\*7** *Kaplan v. LCB*, 405 F.Supp.3d at 534 (emphases ours). Referring to this Court's discussion of that framework in *Linde*, the court continued:

> To adequately plead the "general awareness" element, a plaintiff must plausibly allege that the defendant was " 'aware' that, by assisting the principal, it is itself assuming a 'role' in terrorist activities." *Linde*, 882 F.3d at 329 (citing *Halberstam*, 705 F.2d at 477). *In the context of an ATA action against a bank, such awareness does not require proof of specific intent or knowledge of the particular attacks at issue. Id*. However, *it does require a showing that in providing financial services*, the bank "was *'generally aware'* that it was thereby *playing a 'ole'* in [the terrorist organization's] violent or life-endangering activities," *which "requires more than the provision of material support to a designated terrorist organization*." *Id*. (emphasis omitted) (citing *Halberstam*, 705 F.2d at 477).

*Kaplan v. LCB*, 405 F.Supp.3d at 534-35 (emphases ours). But the court found that the Plaintiffs here

> do not offer any non-conclusory allegations that Defendant was aware that, by providing financial services to the Five Customers, it was playing a role in violent or life-threatening acts intended to intim[id]ate or coerce civilians or affect a government. Plaintiffs principally argue that Defendant had such awareness because Defendant knew, or should have known, that the Five Customers are "integral

constituent parts" and leaders of Hizbollah. ... However, as Defendant correctly notes, none of the Five Customers were designated by the United States--prior to the rocket attacks in [Jul]y and August 2006--as having an affiliation with Hizbollah.

*Id.* at 535. The court discounted the SAC's allegations that LCB "knew or should have known prior to the attacks about the connection between Hizbollah and the Five Customers" *Id.* It noted that there were allegations

> for example, that "[t]he fact that Shahid, Bayt al-Mal and Yousser were integral constituent parts of Hizbollah was openly, publicly and repeatedly acknowledged and publicized by Hizbollah during the several year period prior [to] July 12, 2006" on Hizbollah's websites, press releases, television and radio stations, press conferences, and interviews. (SAC ¶ 78.) *Shahid's connection with Hizbollah was also allegedly "repeatedly publicized" "in various English-language publications." (Id. ¶ 79.)*

*Kaplan v. LCB*, 405 F.Supp.3d at 535 (emphasis ours). But the court found these to be insufficient because "Plaintiffs nowhere allege ... that Defendant read or was aware of such sources." *Id.* The court concluded:

> Even assuming, *arguendo*, that Defendant knew or should have known prior to the attacks about the Five Customers' relationships with Hizbollah, failure to perform due diligence on clients or to adhere to sanctions and counter-terrorism laws do not, on their own, equate to knowingly playing a role in terrorist activities.

*Id.*

The court also found that the SAC lacked sufficient factual allegations that LCB's services assisted Hizbollah's acts of terrorism. Again referring to the *Halberstam* framework, the court noted that

**\*8** [s]ix factors are relevant to determining knowing and substantial assistance: "(1) the nature of the act encouraged, (2) the amount of assistance given by defendant, (3) defendant's presence or absence at the time of the tort, (4) defendant's relation to the principal, (5) defendant's state of mind, and (6) the period of defendant's assistance." *Linde*, 882 F.3d at 329 (citing *Halberstam*, 705 F.2d at 483-84). As the Second Circuit has observed, "aiding and abetting focuses on the relationship between the act of international terrorism and the secondary actor's alleged supportive conduct.[]" *Id.* at 331.

*Kaplan v. LCB*, 405 F.Supp.3d at 536. Within this framework, the court concluded that

Plaintiffs do not advance any factual, non-conclusory allegations that Defendant knowingly and intentionally supported Hizbollah in perpetrating the rocket attacks. In particular, *although Plaintiffs assert that Defendant processed millions of dollars' worth of wire transfers through the LCB Accounts, Plaintiffs do not plausibly allege that Hizbollah received any of those funds or that Defendant knew or intended that Hizbollah would receive the funds*. Nor do Plaintiffs sufficiently allege that Defendant knew, prior to the attacks, *about any affiliations* between *Hizbollah and the Five Customers* under whose names the LCB Accounts were held, as discussed above.

Plaintiffs assert that Defendant effectuated the wire transfers *pursuant to its "long-standing official policy and practice of support for Hizbollah[ ]" and Hizbollah's "anti-Israel program, goals and activities*," (SAC ¶¶ 93, 97), *but they again fail to provide a sufficient factual basis for this claim*. The only support they provide are the *U.S. Treasury's designation in February 2011 of Defendant as a "primary money laundering concern,"* (*id.* ¶ 98), *and certain allegations made by the United States in a forfeiture action brought against Defendant in December 2011*, (*id.* ¶ 97 (incorporating by reference the complaint filed in *United States v. Lebanese Canadian Bank, SAL*, No. 11 Civ. 9186 (PAE)).) *To be sure, the U.S. Treasury's analysis and the complaint in the forfeiture action include damning allegations that Defendant was involved in a money laundering scheme with links to Hizbollah.... Neither the analysis nor the complaint, however, suggests that Defendant supported Hizbollah's "anti-Israel" agenda* or that Defendant provided financial services to the Five Customers *pursuant to* this agenda. Accordingly, Plaintiffs'

claim of aiding and abetting cannot withstand a motion to dismiss.

*Kaplan v. LCB*, 405 F.Supp.3d at 536 (emphases ours).

A final judgment was entered dismissing the second amended complaint in its entirety. *See Kaplan v. Lebanese Canadian Bank, SAL*, Judgment, November 4, 2019. This appeal followed.

E. *Issues on Appeal*

In this appeal, the operative notice of appeal--unaccountably filed under the caption "*Yaakov Licci*, et al. v. Lebanese Canadian Bank, SAL"--states, *inter alia*, that "all plaintiffs in the above-captioned action appeal from each and every part of" the September 20, 2019 Decision and the November 4, 2019 Judgment (Amended Notice of Appeal dated December 4, 2019 (emphasis added)). However, Plaintiffs' briefs on appeal contain no arguments for reversal of the dismissal of their claims for primary liability under the ATA or for conspiracy liability under JASTA. Indeed, their opening brief, after noting that "[t]he SAC asserted primary and secondary liability claims," states that Plaintiffs "seek reversal of the dismissal of their *aiding-and-abetting* claims under § 2333(d)," without mentioning any other claims. (Plaintiffs' brief on appeal at 9 (emphasis added).) Accordingly, we address only Plaintiffs' aiding-and-abetting claims under JASTA, all other claims having been abandoned. *See generally Otero v. Bridgeport Housing Authority*, 297 F.3d 142, 144 (2d Cir. 2002); *Day v. Morgenthau*, 909 F.2d 75, 76 (2d Cir. 1990); Fed. R. App. P. 28(a)(9).

II. DISCUSSION

**\*9** On appeal, Plaintiffs argue that the district court erred in dismissing the second amended complaint for failure to state a claim, contending principally (1) that in considering their claims that LCB should be held liable as an aider and abettor of Hizbollah's 2006 Summer rocket attacks, the court did not properly apply the *Halberstam* legal framework for analyzing JASTA claims of aiding and abetting; and (2) that in assessing Plaintiffs' allegations as to the importance of, and LCB's awareness of, its assistance to Hizbollah's terrorist activities, the court failed to draw permissible inferences from the SAC's factual allegations and erred in its assessment of plausibility. Given Congress's intended scope of JASTA, the *Halberstam* framework, and our standard of review, we find merit in Plaintiffs' contentions.

A. *Standard of Review*

In order to survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) ("*Iqbal*") (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) ("*Twombly*")).

> A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. [*Twombly*, 550 U.S.] at 556, 127 S.Ct. 1955. The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully. *Ibid.*

*Iqbal*, 556 U.S. at 678, 129 S.Ct. 1937.

In reviewing a Rule 12(b)(6) dismissal, we must accept as true all nonconclusory factual allegations in the complaint and draw all reasonable inferences in the Plaintiffs' favor. *See, e.g., Rothstein*, 708 F.3d at 94; *see also Iqbal*, 556 U.S. at 679, 129 S.Ct. 1937 ("When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief."). Further, we

> must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice.

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322, 127 S.Ct. 2499, 168 L.Ed.2d 179 (2007) (citing 5B C. Wright & A. Miller, *Federal Practice and Procedure* §

1357 (3d ed. 2004 & Supp. 2007)). The proper question is whether there is a permissible relevant inference from "*all* of the facts alleged, taken collectively," not whether an inference is permissible based on "any individual allegation, scrutinized in isolation." Tellabs, 551 U.S. at 323, 127 S.Ct. 2499 (emphasis in original).

Whether the factual allegations, given the inferences that can reasonably be drawn from them, state a claim on which relief can be granted is a question of law that we consider *de novo*. *See*, *e.g.*, Rothstein, 708 F.3d at 90. "Determining whether a complaint states a plausible claim for relief ... [is] a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Iqbal, 556 U.S. at 679, 129 S.Ct. 1937. If the facts alleged are ambiguous, the applicable substantive law defines the range of inferences that are permissible. *See*, *e.g.*, id. at 675, 129 S.Ct. 1937 ("In Twombly, [550 U.S.] at 553-554, 127 S.Ct. 1955, ... the Court found it necessary first to discuss the antitrust principles implicated by the complaint."). Accordingly, "we begin by taking note of the elements a plaintiff must plead to state a claim ...." Iqbal, 556 U.S. at 675, 129 S.Ct. 1937.

B. *The Substantive Law*

1. *JASTA*

Congress enacted JASTA in 2016 by amending the ATA to add a new subsection (d) to 18 U.S.C. § 2333, allowing an American national injured by an act of international terrorism to recover from a person who aided and abetted or conspired in that act. With "person" defined to include individuals and other entities, *see* 18 U.S.C. § 2333(d)(1), JASTA provides as follows:

> **\*10** (2) Liability.--*In an action under subsection (a) for an injury arising from an act of international terrorism committed, planned, or authorized by an organization that had been designated as a foreign terrorist organization* under section 219 of the Immigration and Nationality Act (8 U.S.C. 1189), *as of the date on which such act of international terrorism was committed, planned, or authorized, liability may be asserted as to any person who aids and abets, by knowingly providing substantial assistance*, or who conspires with the person who committed such an act of international terrorism,

*id*. § 2333(d)(2) (emphases added).

Congress's stated purpose in enacting JASTA was "to provide civil litigants with *the broadest possible basis*, consistent with the Constitution of the United States, to seek relief *against persons [and] entities ... that have provided material support* ... to foreign organizations or persons that engage in terrorist activities against the United States," whether "*directly or indirectly*." JASTA, Pub. L. No. 114-222, § 2(b), 130 Stat. at 853 ("Purpose") (emphases added).

LCB argues that the SAC fails to state a JASTA claim of aiding and abetting because, *inter alia*, it does not allege that any of the Customers to whom LCB is alleged to have given assistance was a person who committed an act of international terrorism. (*See* LCB brief on appeal at 37 ("The SAC ... does not allege that any of the Five Customers themselves engaged in violent or life-endangering activities or were part of Hizbollah's militia."); *id*. at 28 ("JASTA requires that the defendant was 'generally aware of his role as part of an overall illegal or tortious activity' when he 'knowingly provid[ed] substantial assistance' *to* 'the person who committed' the 'act of international terrorism.' " (first quoting Halberstam, 705 F.2d at 477; otherwise quoting 18 U.S.C. § 2333(d)(2)) (emphasis added).)) But in arguing that the substantial assistance must be given "to" the person who committed international terrorism, LCB disregards Congress's instruction that JASTA is to be read broadly and to reach persons who aid and abet international terrorism "directly or indirectly," JASTA, Pub. L. No. 114-222, § 2(b), 130 Stat. at 853. As quoted above, while JASTA states that to be liable for conspiracy a defendant would have to be shown to have "conspire[d] with" the principal, it does not say that for aiding-and-abetting liability to be imposed a defendant must have given "substantial assistance to" the principal; it simply says the defendant must have given "substantial assistance."

Although our opinion in *Siegel* contains phrasing similar to that in LCB's brief, as in affirming the Rule 12(b)(6) dismissal of JASTA claims we noted that the "plaintiffs did not adequately allege .... that the defendants ... provided substantial assistance to the terrorist organization that perpetrated [the attacks at issue]," *Siegel*, 933 F.3d at 219;

*see also id*. at 222 (plaintiffs did "not plausibly allege[ ] that" the defendant "provided substantial assistance to" the terrorist organization al-Qaeda in Iraq), we did not suggest that JASTA required that the assistance be direct. Indeed, we noted explicitly

> that the statute does not, by its terms, limit aiding-and-abetting liability to those who provide direct support to terrorist organizations, and Congress wrote that its purpose in enacting the statute was "to provide civil litigants with the *broadest possible basis*" to seek relief against those who "have provided material support, *directly or indirectly*, to foreign organizations or persons that engage in terrorist activities against the United States." 18 U.S.C. § 2333 Statutory Notes (quoting JASTA, § 2(b), 130 Stat. at 853) (emphases added).

**\*11** 933 F.3d at 223 n.5 (emphasis in *Siegel*). The expressly stated Purpose of having JASTA reach persons who provide support for international terrorism "directly or indirectly," JASTA, Pub. L. No. 114-222, § 2(b), 130 Stat. at 853, reveals that Congress's use of the uncabined phrase "providing substantial assistance" without adding the word "to," was intentional rather than inadvertent.

In sum, we reject LCB's contention that the SAC was deficient for not alleging that LCB's customers themselves committed actions of international terrorism. The language and purpose of JASTA are meant to allow an aiding-and-abetting claim where the defendant's acts aided and abetted the principal even where his relevant substantial assistance was given to an intermediary.

2. *The* Halberstam *Elements*

As noted by the district court, Congress in enacting JASTA stated that the proper legal framework for assessing JASTA claims is that set out in *Halberstam*, 705 F.2d 472. *Halberstam* articulated three elements of aiding-and-abetting liability: (1) "the party whom the defendant aids must perform a wrongful act that causes an injury," (2) "the defendant must be generally aware of his role as part of an overall illegal or tortious activity at the time that he provides the assistance," and (3) "the defendant must knowingly and substantially assist the principal violation." Id. at 477. *Halberstam* differentiated aiding and abetting from conspiracy, noting that whereas "conspiracy involves an agreement to participate in a wrongful activity[, a]iding-abetting focuses on whether a defendant knowingly gave 'substantial assistance' to someone who performed wrongful conduct, *not* on whether the defendant *agreed to join* the wrongful conduct." Id. at 478 (emphases added).

As to its third aiding-and-abetting element, *Halberstam* also identified the following six "factors" that may help in the assessment of whether the amount of encouragement or assistance proven is sufficient to constitute "substantial" assistance:

> (1) the nature of the act encouraged, (2) the amount of assistance given by defendant, (3) defendant's presence or absence at the time of the tort, (4) defendant's relation to the principal, (5) defendant's state of mind, and (6) the period of defendant's assistance.

Linde, 882 F.3d at 329 (citing *Halberstam*, 705 F.2d at 483-84). Plainly these factors are "variables," *Halberstam*, 705 F.2d at 483, and the absence of some need not be dispositive.

In *Halberstam* itself, for example, Linda Hamilton, the live-in companion of Bernard Welch, was held civilly liable for aiding and abetting the murder by Welch of Michael Halberstam during a burglary of Halberstam's home, despite the facts that Hamilton was not present and was not aware that Welch was planning even to burglarize Halberstam, let alone kill him. *See* 705 F.2d at 474, 487. Supporting both the second and third *Halberstam* elements, however, there was voluminous evidence that Welch was engaged in some pattern of nocturnal property crimes--most significantly, that he left their home for several hours most evenings, and that the couple enjoyed great wealth despite Welch's lack of regular employment. In sum, "it defi[ed] credulity that Hamilton did not know that *something* illegal was afoot," id. at 486 (emphasis added). As to the assistance portion of the third *Halberstam* element, the court noted that Hamilton, according to "her own testimony," provided "invaluable service to the enterprise as banker, bookkeeper, recordkeeper, and secretary," and "[s]he performed these services in an unusual way under unusual circumstances for a long period of time and thereby helped launder the loot and divert attention from Welch." Id. at 487.

**\*12** As to the amount and type of assistance needed to qualify as "substantial" in order to impose aiding-and-

abetting liability, *Halberstam* noted that a court might well reason that culpability for the same amount of assistance would increase with an increase in either the blameworthiness of the tortious act aided or the seriousness of the foreseeable consequences. *See* 705 F.2d at 484 n.13. The court also noted that "[t]he length of time an alleged aider-abettor has been involved with a tortfeasor almost certainly affects the quality and extent of their relationship and probably influences the amount of aid provided as well; additionally, it may afford evidence of the defendant's state of mind." *Id*. at 484. The duration of Hamilton's assistance "strongly influenced" the court's "sense of how Hamilton perceived her role and of the value of her assistance to Welch." *Id*. at 488.

The court concluded that Welch's killing of Halberstam was a "natural and foreseeable consequence of the activity Hamilton helped Welch to undertake," *id*. at 488, and that for purposes of aiding-and-abetting liability,

> [i]t was not necessary that Hamilton knew specifically that Welch was committing burglaries. Rather, when she assisted him, *it was enough that she knew he was involved in some kind of personal property crime at night--* whether as a fence, a burglar, or armed robber made no difference--because *violence and killing is a foreseeable risk in any of these enterprises*,

*id*. (emphases added).

3. *Our Prior JASTA Discussions and Decisions*

This Court has discussed the effect of JASTA in several cases, only one of which, *Siegel*, squarely involved the sufficiency of the complaint. *See* Weiss v. National Westminster Bank PLC, 993 F.3d 144 (2d Cir. 2021); *Siegel*, 933 F.3d 217; and *Linde*, 882 F.3d 314; *see also* Force v. Facebook, Inc., 934 F.3d 53 (2d Cir. 2019) (affirming the 12(b)(6) dismissal of JASTA claims against Facebook on the basis of its immunity under § 230 of the Communications Decency Act).

a. Linde

*Linde* was an ATA action that was tried to verdict prior to the enactment of JASTA. The claim was that the defendant bank had provided material support to the FTO Hamas, in violation of 18 U.S.C. § 2339B. The jury found in favor of the plaintiffs after being instructed that the "provision of material support to a designated [FTO]" in violation of § 2339B "necessarily proved the bank's commission of an act of international terrorism. This [instruction] was error." *Linde*, 882 F.3d at 325 (footnote omitted). By the time the appeal was argued, JASTA had become law, and we noted that Congress had accorded it a measure of retroactive effect, *see id*. at 319-20, with the result that "plaintiffs [do] not have to prove that the [defendant's] own acts constitute[d] international terrorism," *id*. at 328. The JASTA-related question before us in *Linde* was whether the availability of that aiding-and-abetting claim made the instructional error on the ATA claim one that was harmless.

After discussing the *Halberstam* framework, we concluded that the *Linde* plaintiffs were not entitled to have the verdict upheld on a JASTA aiding-and-abetting-related theory of harmless error, because the jury had not been given an aiding-and-abetting instruction. And although we noted that such a JASTA claim would normally need to be pursued at a new trial, *see* 882 F.3d at 328-39, we had no need to rule on the sufficiency of the evidence to support that claim because, in advance of the appeal, the parties had agreed to settle the case on terms that would vary depending on whether the judgment was affirmed, vacated, or reversed, and had agreed in any event to forgo any further trial, *see*, *e.g.*, *id*. at 318, 332-33.

LCB acknowledges that the *Linde* "Court ... merely held that since no aiding and abetting claim under JASTA had been presented to the jury at trial, it was not the role of this Court, in the first instance, to determine the viability of such a claim[,] *Linde*, 882 F.3d at 330." (LCB brief on appeal at 46 n.30.) Nonetheless, LCB argues that the Rule 12(b)(6) dismissal in this case should be affirmed on the ground (1) that "*Linde* ... rejected the very theory of liability proffered by Plaintiffs here" (LCB brief on appeal at 37), or (2) that *Linde* held that a JASTA aiding-and-abetting plaintiff must plead and prove the defendant's intent to participate in international terrorism (*see id*. at 38-39). Neither argument has merit.

**\*13** LCB's contention that our opinion in "*Linde* ... rejected the very theory of liability proffered by Plaintiffs here"-- which LCB characterizes as seeking recovery based on "[a]llegations that LCB provided routine banking services to the Five Customers in connection with non-violent social

service activities" (LCB brief on appeal at 37)--does not require extended discussion. Plaintiffs plainly did not allege that LCB's provision of banking services to the Customers was "routine." Rather, the SAC alleged that LCB violated banking regulations and disregarded its own internal policies in order to grant its known Hizbollah-affiliated Customers "special exceptions" that permitted those Customers to deposit hundreds of thousands of dollars a day without complying with the requirement that the source of funds be disclosed. (*See*, *e.g.*, SAC ¶ 82; U.S. Verified Complaint ¶ 47(g).) Nor did the SAC suggest that the Customers' relevant operations were benign. It alleged that Shahid was known to subsidize the families of Hizbollah suicide bombers--and indeed to provide financial reassurance to "*prospective*" suicide bombers (SAC ¶ 22 (internal quotation marks omitted; emphasis ours)). Further, *Linde* itself did not characterize Plaintiffs' claims at all. Rather, *Linde* noted that its statement--that "the mere provision of 'routine banking services to organizations and individuals said to be affiliated with' terrorists" is not sufficient to show that the defendant itself committed an act of terrorism--was made "*in the context of a challenge to proof of the causation element* of an ATA claim." *Linde*, 882 F.3d at 327 (quoting *In re Terrorist Attacks on Sept. 11, 2001*, 714 F.3d 118, 124 (2d Cir. 2013) (emphasis ours)); *see also Linde*, 882 F.3d at 327 (noting that whether a defendant bank's "financial services to [an FTO or its affiliates should or] should not be viewed as routine" is a "question[ ] of fact for a jury to decide").

Nor is there merit in LCB's contention that *Linde* held that a JASTA aiding-and-abetting plaintiff must prove the defendant's intent to further terrorist activity. LCB states that in applying the *Halberstam* principles, *Linde* "held that JASTA's general awareness element is not satisfied merely by alleging that a bank provided financial services to customers allegedly linked to an FTO," and that "[w]hat is required are factual allegations plausibly showing that a defendant[ ] bank, by prov[id]ing financial services to those customers, *intended* to further the FTO's terrorist activities or was aware that it was playing a role in the violent, life-endangering terrorist activities of that FTO." (LCB brief on appeal at 38-39 (citing *Linde*, 882 F.3d at 329) (emphasis added; other emphasis omitted).) Although LCB's formulation parallels portions of the *Linde* discussion, it shares none of the context.

*Linde*'s discussion of JASTA and the *Halberstam* elements concerned the question of whether the newly available JASTA cause of action for aiding and abetting could make the trial court's erroneous instruction on § 2339B harmless. We compared (a) the mens rea element of the § 2339B material-support prohibition to (b) the second *Halberstam* element of JASTA aiding and abetting, *i.e.*, the defendant's general awareness of playing a role in the principal's tortious activity, and we noted that neither of those civil claims required proof of intent, unlike the mens rea element of aiding and abetting as a crime. Having expressly noted that to be held liable for JASTA aiding and abetting, a defendant must be shown, *inter alia*, to have been " 'generally aware of his role as part of an overall illegal or tortious activity at the time he provides the assistance,' " *Linde*, 882 F.3d at 329 (quoting *Halberstam*, 705 F.2d at 487), our discussion was as follows:

> From the charge given and the verdict returned[ on the § 2339B claim], we can ... assume that the jury found Arab Bank to have provided material support in the form of financial services to what it knew was a designated terrorist organization. But aiding and abetting an act of international terrorism requires more than the provision of material support to a designated terrorist organization. Aiding and abetting requires the secondary actor to be "aware" that, by assisting the principal, it is itself assuming a "role" in terrorist activities. *Halberstam v. Welch*, 705 F.2d at 477. *Such awareness may not require proof of the specific intent demanded for criminal* aiding and abetting culpability, *i.e., defendant's intent to participate in a criminal scheme as "something that he wishes to bring about and seek by his action to make it succeed."* *Rosemond v. United States*, [572 U.S. 65, 75], 134 S.Ct. 1240, 1248, 188 L.Ed.2d 248 (2014) (internal quotation marks omitted).[10] Nor does awareness require proof that Arab Bank knew of the specific attacks at issue when it provided financial services for Hamas. *What the jury did have to find was that, in providing such services, the bank was "generally aware" that it was thereby playing a "role" in Hamas's violent or life-endangering activities*. *Halberstam v. Welch*, 705 F.2d at 477. This is different from the *mens rea* required to establish material support in violation of 18 U.S.C. § 2339B, which requires only knowledge of the organization's connection to terrorism, not intent to further its terrorist activities or awareness that one is playing a role in those activities.

> **\*14** [10] This is not to say that evidence of intent is irrelevant to an ATA aiding and abetting claim. Rather, *evidence of the secondary actor's intent can bear on his state of mind, one of the factors properly considered in deciding whether the defendant's assistance was*

*sufficiently knowing and substantial to qualify as aiding and abetting. See Halberstam v. Welch*, 705 F.2d at 484.

*Linde*, 882 F.3d at 329-30 & n.10 (emphases ours) (record citations and other emphases omitted).

Thus, this *Linde* discussion, after stating that "aiding and abetting ... requires more than the provision of material support" to an FTO, in the next sentence identifies a *Halberstam* additional mens rea element by stating that "[a]iding and abetting requires" that the defendant have been "aware" that it was playing a role in terrorism. *Linde*, 882 F.3d at 329. *Linde* then explains that this general awareness element need not include proof of the defendant's "specific intent," as would be required to prove a crime, citing *Rosemond v. United States*, 572 U.S. 65, 75, 134 S.Ct. 1240, 188 L.Ed.2d 248 (2014). *Linde*, 882 F.3d at 329.

*Linde*'s footnote at this point observes that intent is "not ... irrelevant" to the JASTA cause of action, as "evidence of the secondary actor's intent can bear on his state of mind" in connection with the third *Halberstam* element of knowing and substantial assistance. *See* 882 F.3d at 329 n.10. Thus, a plaintiff may introduce evidence of intent in order to prove other elements of the aiding-and-abetting claim; but a plaintiff is not required to plead evidence, *see generally Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 512-13, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002), and an absence of proof of intent is not fatal to the aiding-and-abetting claim because intent is not itself a *Halberstam* element.

Resuming in the text, *Linde* observes that in order to make the instructional error harmless in the case before it, "[w]hat the jury did have to find was that, in providing such services, the bank was 'generally aware' that it was thereby playing a 'role' in Hamas's violent or life-endangering activities." 882 F.3d at 329 (quoting *Halberstam*, 705 F.2d at 477). *Linde* notes that "[t]his is different from the *mens rea* required to establish material support in violation of 18 U.S.C. § 2339B, which *requires only knowledge* of the organization's connection to terrorism, *not intent* to further its terrorist activities"--which would, as *Linde* had stated earlier, be required under *Rosemond* for criminal aiding-and-abetting liability--"or awareness that one is playing a role in those activities," which *Linde* stated earlier would be required under *Halberstam* for JASTA aiding-and-abetting liability. *Linde*, 882 F.3d at 329-30 (emphases added).

LCB also contends *Linde* forecloses the argument that "providing banking services to an entity or individual that a bank knows or should know is affiliated with a terrorist organization is sufficient to plead aiding and abetting liability under JASTA because a foreseeable consequence of such support is the commission of a terrorist act by the FTO." (LCB brief on appeal at 22-23, *see also id*. at 38-39). However, nothing in *Linde* repudiates the *Halberstam* standard that a defendant may be liable for aiding and abetting an act of terrorism if it was generally aware of its role in an "overall illegal activity" from which an "act of international terrorism" was a foreseeable risk. *See Halberstam*, 705 F.2d at 488. Our statement that aiding-and-abetting liability "requires *more than* the provision of material support to a terrorist organization," *Linde*, 882 F.3d at 329 (emphasis added), does not establish that material support to an FTO is never sufficient for aiding-and-abetting liability. Instead, that statement articulates the principle that knowingly providing material support to an FTO, without more, does not as a matter of law satisfy the general awareness element. *See Linde*, 882 F.3d at 329-30. Whether a defendant's material support to an FTO suffices to establish general awareness is a fact-intensive inquiry. The SAC satisfies the general awareness element because it plausibly alleges the Five Customers were so closely intertwined with Hizbollah's violent terrorist activities that one can reasonably infer that LCB was generally aware while it was providing banking services to those entities that it was playing a role in unlawful activities from which the rocket attacks were foreseeable.

**\*15** We conclude that *Linde* does not hold or suggest that a JASTA aiding-and-abetting claim requires proof of the defendant's intent or that knowingly providing material support to an FTO is never sufficient to establish JASTA aiding-and-abetting liability.

b. Weiss

In *Weiss*--an appeal following the dismissal of ATA primary-liability claims on summary judgment--we considered the district court's denial of the plaintiffs' motion to amend their complaint to assert JASTA claims. The district court had concluded, based on the undisputed factual record as to the state of the defendant bank's knowledge--developed during some 10 years of pretrial discovery-that plaintiffs' proposed amendment would be futile. We affirmed because the record was insufficient to show that the bank had been knowingly providing substantial assistance to the FTO Hamas or that it was generally aware that it was playing a role in Hamas's acts of terrorism. *See* 993 F.3d at 163-67.

c. Siegel

As indicated, *Linde* and *Weiss* were not decided on the basis of their pleadings. In *Siegel*, however, we considered the district court's Rule 12(b)(6) dismissal of claims under JASTA against HSBC Bank USA, N.A., and its parent company (collectively "HSBC"), alleging injuries from a series of terrorist attacks in Jordan on November 9, 2005. The plaintiffs alleged that HSBC had aided and abetted the attacks by providing financial services to Al Rajhi Bank ("ARB"), a prominent Saudi bank. We have described the *Siegel* complaint as alleging principally

> that al-Qaeda in Iraq ("AQI") was the terrorist organization responsible for the attacks; that ARB had links to terrorist organizations including AQI; that HSBC was aware of ARB's links to terrorist organizations; that ARB was, at all relevant times, involved in financing terrorist activity; that the government of Saudi Arabia was monitoring ARB accounts for links to terrorist organizations; that in 2003, the United States Central Intelligence Agency referred to ARB as a conduit for terrorist transactions; that in 2004, the United States government designated several Saudi-based non-profit organizations--all of which were clients of ARB--as terrorist organizations; that HSBC internal communications in 2002 and 2003 revealed that senior officers within the company were concerned that ARB's account may have been used by terrorists, and that one of ARB's clients had been linked to AQI; that despite HSBC's knowledge of ARB's support of terrorist organizations, HSBC provided ARB with a wide range of banking services, including wire transfers, foreign exchange, trade financing, and asset management services; and that HSBC helped ARB to conceal the passage of billions of U.S. dollars through the United States, and provided ARB with the means to transfer millions of U.S. dollars to AQI which was actively engaged in planning and perpetrating the murder and maiming of Americans, including the victims of the November 2005 bombings in Jordan[ and that] ... ARB was an HSBC customer for some 25 years, until January 2005 when HSBC decided to sever ties with ARB due to its concerns about possible terrorist financing.

*Weiss*, 993 F.3d at 165 (citing *Siegel*, 933 F.3d at 220-21).

We affirmed the dismissal of the *Siegel* complaint for failure to state an aiding-and-abetting claim under JASTA "because the plaintiffs ha[d] not plausibly alleged that HSBC assumed a role in the November 9 Attacks or provided substantial assistance to AQI," 933 F.3d at 222. Their complaint "fail[ed] to advance any plausible, factual, non-conclusory allegations that HSBC knew or intended that" the funds it forwarded for ARB "would be sent to AQI or to any other terrorist organizations," *id*. at 225; and it lacked any factual "allegations that would support a conclusion that HSBC knowingly played a role in the terrorist activities," *id*. at 224. We found insufficient the complaint's allegations that, viewed in the light most favorable to the plaintiffs, suggested that HSBC "was aware," based on "public reports," that its banking customer "*was believed by some* to have links to ... terrorist organizations," *id*. at 224 & n.6 (emphasis added). And we noted, "crucially," that the complaint revealed that "in January 2005--ten months before the November 9 attacks-- HSBC ceased doing business with ARB altogether." *Id*. at 224. Despite HSBC's past dealings with ARB, we concluded that "HSBC's decision not to provide banking services to ARB for the ten months preceding the November 9 Attacks makes it implausible under the circumstances that HSBC knowingly assumed a role in the Attacks." *Id*.

**\*16** While LCB contends that our affirmance of the dismissal of the complaint in *Siegel* should persuade us to affirm the dismissal here, the obvious differences between the *Siegel* complaint and the SAC here compel us to disagree. For one thing, as just noted, the complaint in *Siegel* revealed that HSBC, after learning of reports that ARB had customers who were terrorists, terminated its relationship with ARB

nearly a year before the relevant terrorist attacks occurred--a stark difference from the allegations in the SAC and the U.S. Verified Complaint that, after the U.N. report in 2002 that LCB's service to one of its customers constituted money laundering for Hizbollah, LCB responded by stating that the report was "part of the propaganda and war launched by the Jewish state against Lebanon," and by increasing that customer's credit limit (SAC ¶ 97(a); U.S. Verified Complaint ¶ 47(f)).

In addition, there are conspicuous differences between this case and *Siegel* as to the customers that were served by the respective defendant banks. In *Siegel*, HSBC's relevant customer was another bank, ARB, Saudi Arabia's largest bank with vast worldwide operations. While there were news articles and United States government studies that stated that ARB had terrorist organizations as clients, there was no suggestion in the *Siegel* complaint that HSBC itself had any such clients; and the *Siegel* complaint lacked "any plausible, factual, non-conclusory allegations that HSBC knew" that the funds they forwarded for ARB "would be sent to AQI or to any other terrorist organizations," *id.* at 225.

Here, in contrast, the SAC alleged that the relevant customers of LCB were persons and entities who were in fact integral parts of Hizbollah, and that LCB knew this was so because Hizbollah repeatedly publicized those relationships on Hizbollah websites and in news media that included Hizbollah's own radio and television stations. With that knowledge, LCB, in knowing violation of banking regulations, granted special exceptions to its Hizbollah-related Customers, allowing them to deposit up to $360,000 a day plus up to $80,000 a week and, in Lebanese currency the equivalent of up to another $33,000 a week and $132,000 a day--all without disclosing the sources of the funds--and thereby to circumvent existing sanctions on Hizbollah as a designated FTO. Our conclusion that there was a failure to state a claim of JASTA aiding and abetting in *Siegel* in no way suggests that the very different allegations in the present action were insufficient.

C. *The Plausibility of the Second Amended Complaint*
As discussed, the *Halberstam* requirements for a claim of aiding and abetting are (1) that the person whom the defendant aided must have performed a wrongful act that caused injury, (2) that the defendant must have been "generally aware of his role as part of an overall illegal or tortious activity at the time that he provide[d] the assistance," and (3) "the defendant must [have] knowingly and substantially assist[ed] the principal violation." 705 F.2d at 477. There is no dispute here that the attacks in which Plaintiffs were injured were committed by Hizbollah. (*See*, *e.g.*, LCB brief on appeal at 1 ("Plaintiffs do not claim that LCB launched those rockets. Hizbollah did.").) As set out in Part I.D. above, the district court found that the SAC failed to state an aiding-and-abetting claim under JASTA because it lacked factual allegations with respect to the second and third *Halberstam* elements, *i.e.*, (a) general awareness and (b) knowing and substantial assistance. We disagree with both conclusions.

1. *General Awareness*

For the *Halberstam* general-awareness standard, a plaintiff must plead and prove, *inter alia*, that the defendant was "*generally* aware of his role as part of an overall illegal or tortious activity," *Halberstam*, 705 F.2d at 487-88 (emphasis added). The district court initially stated this standard. *See*, *e.g.*, *Kaplan v. LCB*, 405 F.Supp.3d at 534. However, it stated that in order "to adequately plead the 'general awareness' element," Plaintiffs "must plausibly allege that the defendant was '*aware*,' " *id.* at 534-35 (emphasis added); and it found that the SAC did not sufficiently plead that LCB was "generally aware," that by providing services as it did to the Five Customers it was playing a role in terrorism, in part because there were no nonconclusory allegations that LCB "was aware" that it was playing such a role, *id.* at 535.

**\*17** While the word "aware" normally denotes full recognition of the existence or qualities of an object or circumstance, *Halberstam*'s attachment of the "generally" modifier imparts to the concept "generally aware" a connotation of something less than full, or fully focused, recognition. It is not uncommon, of course, for a court's opinion, in the interests of brevity or lucidity, to employ an abbreviated phrase for a previously identified, lengthier concept; but the district court here said nothing to indicate that it recognized that the requirement that plaintiffs show the defendant's "general awareness" is less demanding than a requirement that they show awareness, or that the court was simply using a shortened form for the mandated element. We note also that the court subsequently stated that the SAC "do[es] not advance any factual, non-conclusory allegations that [LCB] *knowingly* and *intentionally* supported Hizbollah in perpetrating the rocket attacks," *Kaplan v. LCB*, 405 F.Supp.3d at 536 (emphases added), which may have influenced the court's apparent equation of general awareness with awareness. As discussed in Part II.B.3.a. above, JASTA aiding-and-abetting liability, using *Halberstam*'s general

awareness standard, does not require proof that the defendant had a specific intent.

This is not to suggest that JASTA contains no requirement of any actual knowledge before a defendant can be held liable for aiding and abetting terrorism. But the actual knowledge component of the *Halberstam* standard requires that the defendant "know[ ]" that it is providing "assistance," 18 U.S.C. § 2333(d)(2)--whether directly to the FTO or indirectly through an intermediary (as discussed in Part II.B.1. above). That knowledge component "is designed to avoid" imposing liability on "innocent, incidental participants." *Halberstam*, 705 F.2d at 485 n.14. If the defendant knowingly--and not innocently or inadvertently--gave assistance, directly or indirectly, and if that assistance was substantial, then aiding and abetting is sufficiently established if the defendant was "*generally* aware" that it was playing a role in international terrorism.

The district court also found the SAC allegations as to general awareness were insufficient because it rejected the allegations that LCB knew, or should have known, that the Five Customers were integral constituent parts and leaders of Hizbollah, discounting those allegations on the ground that prior to the 2006 Summer rocket attacks the Customers were not so "designated by the United States," *Kaplan*, 405 F.Supp.3d at 535. The court cited no authority for such a prerequisite for knowledge, and we know of none; and it would defy common sense to hold that such knowledge could be gained in no other way.

The SAC alleged that Hizbollah itself--which had been designated by the United States as an FTO since 1997 (SAC ¶ 19)--had between 1982 and July 12, 2006, "openly, publicly, and repeatedly acknowledged" carrying out terrorist attacks against civilians (*id.* ¶ 16), and for "several year[s] ... prior" to the 2006 Summer rocket attacks had "openly, publicly, and repeatedly acknowledged" the "fact that Shahid, Bayt al-Mal and Yousser were integral constituent parts of Hizbollah" (*id.* ¶ 78). LCB argues that such allegations were deficient because the SAC provided no precise dates on which the alleged statements were made and did not identify the Hizbollah speakers by name. We disagree.

A complaint is allowed to contain general allegations as to a defendant's knowledge, *see* Fed. R. Civ. P. 9(b), because "a plaintiff realistically cannot be expected to plead a defendant's actual state of mind," *Connecticut National Bank v. Fluor Corp.*, 808 F.2d 957, 962 (2d Cir. 1987); *see also Ross v. A.H. Robins Co.*, 607 F.2d 545, 558 (2d Cir. 1979), *cert. denied*, 446 U.S. 946, 100 S.Ct. 2175, 64 L.Ed.2d 802 (1980). However, plaintiffs are required to include allegations of the facts or events they claim give rise to an inference of knowledge. *See*, *e.g.*, *Goldman v. Belden*, 754 F.2d 1059, 1070 (2d Cir. 1985); *Ross v. A.H. Robins Co.*, 607 F.2d at 558.

Here, the allegations, although lacking some details, were not insufficient. The SAC named the above three entities that Hizbollah is alleged to have identified as integral parts of Hizbollah; the statements were alleged to have been made in a particular time period (*i.e.*, repeatedly in the several years leading to July 12, 2006), and were specific as to the status of the speaker ("senior Hizbollah officials"), the circumstances in which the statements were made ("press conferences and news media interviews"), and the other specific media in which they were made (Hizbollah's own "official websites," its "official television station, Al-Manar," and its "official radio station, Al-Nour"). (SAC ¶¶ 16, 78.) Any further needed specificity can be sought in discovery.

**\*18** The district court noted the SAC ¶ 78 allegations as to Hizbollah's own publicity, as well as allegations that Shahid's connection with Hizbollah was reported in several English-language publications (*see id.* ¶ 79), but it rejected these allegations as insufficient to permit an inference that LCB had knowledge of the Hizbollah-acknowledged relationships on the ground that the SAC "nowhere allege[d] ... that [LCB] read or was aware of such sources." *Kaplan v. LCB*, 405 F.Supp.3d at 535. However, the court was required to accept as true the above factual allegations as to the repeated multimedia statements by Hizbollah, to consider all of the complaint's allegations, rather than considering each in isolation, and to accept as true all permissible inferences that could be drawn from the complaint as a whole. The SAC's other relevant nonconclusory allegations included that Hizbollah has been a terrorist organization headquartered in Lebanon since 1982, that LCB was a Lebanese bank headquartered in Lebanon, that banking regulations require banks to know their customers, and that Shahid, Bayt al-Mal, and Yousser were customers of LCB in Lebanon since at least 2003. (*See* SAC second ¶ numbered "5," first ¶ numbered "5," and ¶ 82; U.S. Verified Complaint ¶ 47(g)).

As *Halberstam* noted, acts that are "neutral standing alone ... must be evaluated in the context of the enterprise they aided"--in that case, neutral acts by Hamilton in light of Welch's "five-year-long burglary campaign against private homes," 705 F.2d at 488. Here, the context is Hizbollah's policy

and practice of engaging in terrorist raids--and repeatedly publicizing that policy and practice--from the time of its founding in 1982 through and beyond July 12, 2006, *i.e.*, a more than 15-year-long campaign of terrorist attacks against civilians (*see*, *e.g.*, SAC second ¶ numbered "5" and ¶¶ 8-16); and it is against this background that we must evaluate LCB's provision to Hizbollah affiliates, beginning no later than 2003, of banking services that permitted the laundering of money--nearly half a million dollars or dollar equivalents per day--in violation of regulatory restrictions meant to hinder the ability of FTOs to carry out terrorist attacks (*see id*. ¶¶ 82, 97(a); U.S. Verified Complaint ¶ 47(g)).

We conclude that the SAC as a whole contained sufficient factual allegations as to those repeated pre-2006 statements by Hizbollah about Shahid, Bayt al-Mal, and Yousser--and certainly in the period between LCB's formation in 1988, *see Kaplan v. LCB*, 405 F.Supp.3d at 529 n.1, and the 2006 Summer rocket attacks--to make it plausible that LCB knew that those three named customers, as well as the two individuals in whose names Bayt al-Mal accounts at LCB were held, were part of Hizbollah. The extent to which there is evidence to support the allegations as to Hizbollah's statements and as to whether LCB knew or should have known of them is a matter more appropriate for discovery. The plausibility of the allegations as to LCB's knowledge of Hizbollah's terrorist activities and of the Customers' affiliation with Hizbollah is sufficient to permit the inference that LCB was at least generally aware that through its money-laundering banking services to the Customers, LCB was playing a role in Hizbollah's terrorist activities.

2. *Knowing and Substantial Assistance*

Finally, the district court found that the SAC "fail[ed] to plead the 'assistance' element of aiding and abetting under JASTA--that is whether [LCB] 'knowingly and substantially assist[ed] the principal violation.' " *Kaplan v. LCB*, 405 F.Supp.3d at 535-36 (quoting *Halberstam*, 705 F.2d at 477). The court stated two principal rationales: (1) that the SAC lacked "any factual, non-conclusory allegations that [LCB] *knowingly and intentionally supported Hizbollah in perpetrating the rocket attacks*," or "that [LCB] supported Hizbollah's *'anti-Israel' agenda*, or that [LCB] provided financial services to the Five Customers *pursuant to this agenda*," and (2) "[i]n particular," that the SAC "d[id] not plausibly allege that Hizbollah received any of" the millions of dollars that LCB processed for the Five Customers "or that Defendant knew or intended that Hizbollah would receive the funds." *Kaplan v. LCB*, 405 F.Supp.3d at 536 (emphases added). We disagree for several reasons.

**\*19** First, the district court's initial rationale does not properly reflect the *Halberstam* third element, which concerns not whether LCB "intentionally supported Hizbollah in perpetrating the rocket attacks," or acted "pursuant to [Hizbollah's] agenda," *id*., but rather concerns whether LCB aided and abetted Hizbollah by knowingly providing assistance--whether directly to Hizbollah or indirectly--and whether that assistance was substantial. Second, the court stated that "[t]he only" facet of the SAC to suggest that LCB had long supported Hizbollah's "anti-Israel program, goals and activities" was the incorporated U.S. Verified Complaint filed "in December 2011," *id*. (internal quotation marks omitted). Mentioning only the 2011 date the U.S. Verified Complaint was filed, the court does not appear to have considered its allegations as to LCB conduct prior to 2006. These included the allegations that the U.N. reported in 2002 that an LCB customer was engaged in money laundering for Hizbollah; that LCB responded to that report by asserting that the report was Israeli propaganda as part of a "war by the Jewish state against Lebanon"; that LCB increased the permissible amount of activity that the U.N. had found constituted money laundering; and that in the following year, LCB began allowing the Five Customers--which Hizbollah repeatedly and publically said were integral parts of Hizbollah--to conceal their sources of deposited funds totaling nearly half a million dollars per day. (SAC ¶¶ 82, 97(a); U.S. Verified Complaint ¶¶ 47(f) and (g)). The district court apparently either did not take these allegations into account, or did not accept them as true.

We also reject the district court's additional rationale, *i.e.*, that the SAC "d[id] not plausibly allege that Hizbollah received any of" the millions of dollars that LCB processed for the Five Customers "or that [LCB] knew or intended that Hizbollah would receive the funds." First, this rationale is premised on the court's finding that the SAC did not sufficiently allege that LCB had known the Customers were affiliated with Hizbollah--a finding that we rejected in Part II.C.1. above. And as discussed in Part II.B.1. above, a JASTA claim for aiding and abetting an FTO is available even when the defendant has given assistance only indirectly. Second, accepting as true the plausible allegations that LCB knew from the repeated public statements on Hizbollah's websites and by senior Hizbollah officials to the press or on Hizbollah's radio and television stations that Shahid, Bayt al-Mal, and Yousser were integral parts of Hizbollah, it is a permissible

inference that LCB understood that the money in those accounts either belonged to Hizbollah, or would be received by Hizbollah, or would be paid out as directed by Hizbollah.

Finally, given that LCB's special treatment of the Customers allowed them to deposit large sums in various accounts at different LCB branches--totaling more than $2.5 million dollars a week (*see* U.S. Verified Complaint ¶¶ 47(g)(1)-(4), (7))--without disclosing their source, thereby circumventing sanctions imposed in order to hinder terrorist activity, the SAC adequately pleaded that LCB knowingly gave the Customers assistance that both aided Hizbollah and was qualitatively and quantitatively substantial.

CONCLUSION

We have considered all of LCB's arguments in opposition to this appeal and have found them to be without merit. So much of the judgment of the district court as dismissed Plaintiffs' JASTA aiding-and-abetting claims is vacated, and the matter is remanded for further proceedings on those claims.

**All Citations**

--- F.3d ----, 2021 WL 2345642

## Footnotes

\*    The Clerk of Court is instructed to amend the official caption to conform with the above.

End of Document                                                                 © 2021 Thomson Reuters. No claim to original U.S. Government Works.

© 2021 Thomson Reuters. No claim to original U.S. Government Works.                                                                                         18